*G. H. Voss*, for the appellee.

Nov. Term,
1854.

The State
v.
Springfield
Township,
&c.

--- ♦ ---

The State of Indiana and Others *v.* Springfield Township in Franklin County.

| 6 | 83 |
| 126 | 263 |
| 6 | 83 |
| 138 | 407 |
| 6 | 83 |
| 150 | 600 |

The sixteenth section in the several congressional townships in this state was granted by congress to the *inhabitants* of such townships respectively, for the use of schools *therein* and not elsewhere; and the grant was accepted by the state on the terms in which it was made.

By the sale of the sixteenth section in the several congressional townships in this state, under the act of congress of 1828, the proceeds became trust funds, to be applied for the use of schools in such townships respectively, and not elsewhere.

The act of congress of 1828 authorizing the sale of the sixteenth section in the several congressional townships in this state, and the several acts of congress reserving, and also those granting, the sixteenth section in the several townships in this state and other states for the use of schools, being in relation to the same subject-matter, are to be taken in *pari materia* and construed as one act, in ascertaining the purpose of the grant of the sixteenth section of the several townships in this state.

The circumstance that when the sixteenth section in the several townships in this state was granted by congress to the inhabitants for the use of schools therein, there were, in some of the townships, no inhabitants, did not affect the validity of the grant.

A repeal by the legislature of the act creating congressional townships, could not affect the validity of the grant by congress of the sixteenth section in

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

those townships to the inhabitants for the use of schools therein, nor give the state any better right than it otherwise would have had to divert the funds derived from the sale of such sections. The grant in question was a contract executed and incapable of revocation by the legislature.

*Semble*, that so far as the corporate capacity of the several congressional townships relates to the funds derived from the sale of the sixteenth section in such townships, they are private corporations created to meet the terms of the grant by congress of said sections, and their powers can not be repealed by the legislature.

The school law of 1852, so far as it diverts the proceeds of the sale of the sixteenth section in the several congressional townships from the use of schools in such townships respectively to the use of the school system of the state at large, is in contravention of section 7 of article 8 of the constitution.

Thursday,
December 28.

APPEAL from the *Franklin* Circuit Court.

STUART, J.—Appeal from an order of injunction restraining the auditor, treasurer, and board of commissioners of *Franklin* county, from distributing the income of a certain school fund, alleged to belong to the appellee.

The fund in controversy is the proceeds of the sale of the sixteenth section in *Springfield* township. It is claimed that by the act of congress of *April* 19, 1816, that section was granted in every township "to the inhabitants thereof, for the use of schools." The school law of 1852 treats the township fund as the property of the state, and its income subject to her disposal, for the use of the common school system. The complaint is that the defendants are about to execute the law, and thereby divert the income of the *Springfield* township fund, amounting to 7,423 dollars and 36 cents, from the use of the inhabitants of that township, to the support of schools elsewhere.

The prayer of the complaint is, that the defendants be enjoined, &c.

A temporary injunction was granted, agreeably to the prayer of the complaint. From that decision this appeal is prosecuted.

There are no technical objections raised by counsel on either side. Under the rules of Court, we are thus relieved from taking judicial notice of any formal defects which may exist. We therefore proceed, at once, to the principal matter in controversy.

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

The act of the legislature, the validity of which is thus questioned, enumerates the several funds which are to be consolidated under the denomination of the "common school fund." First in the list of consolidated funds, is the congressional township fund.

Prior to 1852, a separate account was kept with each township. R. S. 1843, p. 254. The income of the fund arising out of the sale of the sixteenth section was expended for the use of schools within the township. Thus the inhabitants of each township enjoyed the income of their own particular fund.

The school law of 1852 contemplates an entire change. *Civil* townships, with different boundaries, are substituted for *congressional* townships. There is no longer to be any congressional township fund recognized. All the separate funds, the township, surplus revenue, saline, bank tax, &c., are united. The fund of each township is thus commingled with those of other townships, and with other school funds. Pamphlet School Law, notes, p. 26. The income arising from the consolidated fund is to be distributed ratably throughout the state for the support of common schools.

In brief, the law diverts the proceeds of the sixteenth section from the use of schools in the congressional township where the land was situated, to the use of the school system of the state at large.

And the only question raised is, Was it competent for the state so to divert the township fund?

The appellants claim that the title to the sixteenth section was vested in the state; and that it is her right to expend the income of the fund upon such system of common schools as she may deem best adapted to diffuse the blessings of education among all classes.

The appellees insist that this diversion of the township fund is in conflict with the acts of congress, and in violation of the constitution of the *United States.*

Counsel on both sides seem to take it for granted that the school law is in accordance with the constitution of the state. The same view of the harmony between the

Nov. Term, law and the constitution prevailed, of course, with the
1854.      majority of the legislature that passed the act.   Many of
THE STATE  the leading men who moulded the school law had been
v.         prominent members of the constitutional convention.   The
SPRINGFIELD
TOWNSHIP,  same opinion seems also to have prevailed in the assembly
&c.        of 1853.   Pamphlet School Law, p. 34.

If this opinion be correct, the question now raised on the school law arises on the constitution itself.   To show with what warrant the impression of the accord between the law and constitution is so generally entertained, the eighth article of the latter, and the corresponding sections of the former, are inserted in note 1 at the end of this opinion.

It is not our province to trace the idea of diverting the township fund to its origin; nor to inquire through what channels, legislative or constitutional, that sentiment seemed to run, further than may be useful to elucidate the pending question.

The subject seems to have been broached as early as the session of 1848–9; House Journal, p. 319; and perhaps even earlier.   It was also agitated in the constitutional convention.   At the session of 1851–2, it came to maturity in the form of the act now under consideration.

If the first four sections of article eight (see note 1) stood alone, qualified only by the clause quoted from section twenty-two of article four, the Court would be divided as to whether the constitution itself did not consolidate, and thus divert, the township fund.   But the difficulty seems to be removed by a subsequent section.   The seventh section of article eight, whatever its history, or for whatever purpose introduced, enjoins that "All trust funds, held by the state, shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created."

On the subject of education, the constitution of 1816, and that of 1851, declare, that education, generally diffused, is essential to a free government.   In both its encouragement is enjoined as a duty on the general assembly.   The difference seems to be, that the new constitution gives

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

unity to the school funds, and contemplates a uniform system of common schools as a *state institution*, under an official head.   Section 8, article 8, quoted in note 1.   It is tacitly assumed, that the wealth of the state should educate the children of the state.

Hence any enactment which the wisdom of the legislature might devise, to carry out that policy, should receive the favorable consideration of the Courts, unless it clearly conflict with laws of higher obligation.   *Fletcher* v. *Peck*, 6 Cranch 87.—*Newell* v. *The People*, 3 Selden 9.

Bringing the school law of 1852 to the test of the seventh section of the eighth article of the constitution, let us inquire, what was the purpose for which the congressional township fund was created?

That question must be answered, primarily, by the terms of the grant.   When congress granted the sixteenth section, it is to be presumed the purpose of the grant was expressed.   Accordingly, the sixth section of the act of *April* 19, 1816, "to enable the people of the *Indiana* territory to form a constitution," &c., makes the following, among other propositions, which, "if accepted, shall be obligatory upon the *United States*," viz., "that the section numbered sixteen, in every township, and when such section has been sold, granted or disposed of, other lands equivalent thereto and most contiguous to the same, shall be *granted to the inhabitants of such township for the use of schools.*"   The act is published at length in the revised statutes.   1 R. S. 93.

It is matter of history that these propositions were accepted on the part of the people of *Indiana*, by a solemn ordinance of their constitutional convention.   1 R. S. 95.

In construing language so plain, the only mystery is, how it could ever have given rise to any doubt.   With the terms of the grant in view, the very statement of the question seems equivalent to a decision.   Had the legislature passed an act consolidating the property of *A.* and *B.*, diverting it from their exclusive use, and providing for the ratable distribution of its income amongst *A.*, *B.*, *C.* and *D.*, the case would not be as strong as this.   Yet the un-

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

soundness of such legislation, as violating fundamental principles, would not admit of doubt. Every one could see, at a glance, its vicious tendency and dangerous assumptions. That the inhabitants of the respective townships were *quasi* corporations, called into artificial existence by the legislature, and strangled by the same power when their funds were wanted, does not seem either to distinguish the case nor justify the act. The ingenious hypothesis of counsel does not blunt the force of the illustration.

But the great importance of any question affecting so many interests and persons, putting in issue the constitutional action of the legislature, and involving the unity of a school system so elaborate, and claimed to be so complete, demands an extended and careful consideration.

Prior acts of congress throw an additional light on the intention of the grant. The ordinance of *May* 20, 1785, "to ascertain the mode of disposing of lands in the western territory," provided, that "there should be reserved the lot number sixteen of every township, for the maintenance of public schools within the said township."

The act of *March* 26, 1804, making provision for the disposal of the public lands in the *Indiana* territory, (sec. 6), provides that "the section numbered sixteen in every township," &c., "shall be reserved for the use of schools within the same."

Then follows the grant of *April* 19, 1816, *supra*, to the *inhabitants* for the use of schools.

It is not necessary to pause on the single word in the grant which alone tends to give limits and locality to the munificence of congress. That word is *inhabitants*. It is used in the first section of the act of *April* 19, 1816, *supra*, thus: "Be it enacted," &c., "that the *inhabitants* of the territory of *Indiana* be and they are hereby authorized to form for themselves a constitution and state government," &c. Here it defines and limits the right of forming a constitution, &c., to those who inhabit the *Indiana* territory. It excludes, *ex vi termini*, from participation in the rights conferred by the act, all inhabiting beyond those limits. So in the sixth section it is also a term of exclusion.

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

Those living beyond the limits of the township are excluded from sharing the income of the sixteenth section or its proceeds. The word *inhabitants,* as there used, is of itself sufficiently potent to confine the expenditure of the fund for the use of schools within and for the township.

The intention of congress is further illustrated by subsequent legislation on kindred subjects, wherein it is observable the word *inhabitants* occurs uniformly and with an obvious purpose.

On the admission of *Illinois* by the act of *April* 18, 1818, and *Missouri* by the act of *March* 6, 1820, a similar grant was made for the same purpose in somewhat different terms, viz., that "section sixteen in every township," &c., "should be granted to the *state* for the *use of the inhabitants* for the use of schools."

The act of congress of *March* 2, 1819, for the admission of *Alabama,* contains the same propositions made to *Indiana.* The grant of the sixteenth section is also in the same terms, viz., *to the inhabitants, for the use of schools.*

Similar grants have been made in all the new states; but these are selected because the grants have received construction in the state Courts.

In 1827, the legislature of *Indiana* applied to congress to extend to the general assembly the power to sell the school lands. The congressional response, passed *May,* 1828, is couched in these remarkable words:

" That the legislature of the state of *Indiana,* shall be and is hereby authorized to sell and convey in fee simple, all or any part of the lands heretofore reserved and appropriated by congress for the use of schools within said state, and to invest the money arising from the sale thereof in some productive fund, the proceeds of which shall be *forever* applied, under the direction of said legislature, for the use and support of schools, *within the several townships and districts of country for which they were originally reserved and set apart, and for no other purpose whatsoever. Provided,* said land or any part thereof shall in no case be sold, without the consent of the inhabitants of such township or district, to be obtained in such manner as the legis-

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

lature of said state shall by law direct. And *provided*, also, that in the apportionment of the proceeds of said fund, each township and district aforesaid shall be entitled to such part thereof, and no more, as shall have accrued from the sum or sums of money arising from the sale of the school land, belonging to such township or district." *Vide* note 2.

The original impression seems to have been that the lands should be leased, and the rents and profits applied to the use of schools. The policy was to provide a school fund for every locality of six miles, which should be permanent and perpetual. So it seems to have been understood both by congress and the general assembly. R. S. 1824, p. 380. Hence the necessity of obtaining the sanction of congress to the proposed change in the character of the trust.

In this light, the act of *May*, 1828, is to be taken in *pari materia* with other acts on the same subject. Though passed at different sessions of congress, yet as they all relate to the same subject-matter, they are to be taken and construed together as one act. The whole form a body of law from which the purpose of the grant is to be deduced. *Smith* on Statutory and Constitutional Construction, 751.

Thus in 1785 and in 1804, the sixteenth section is *reserved* in each township for the use of schools within the same. In 1816, it is *granted* to the *inhabitants* of such township for the use of schools. In 1828, the sixteenth section may be sold *with the consent of the inhabitants*. It is further provided, as indicative of the original purpose of the grant, that the proceeds be forever applied for the use of schools *within* the *several townships* and districts of country for *which they were originally set apart*, and for *no other purpose whatever*. The several acts for the admission of *Illinois*, *Alabama* and *Missouri*, further illustrate collaterally the purpose of the grant. In all those enactments the language is clear and explicit. The purpose of congress in granting the sixteenth section is for the benefit of the *inhabitants* of the township in which the section is located. Whether the grant be to the state for the use of

Nov. Term, 1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

the *inhabitants*, or directly to the *inhabitants*, is, for the present, immaterial. The point of inquiry is the intention and purpose of the grant. In every instance, to whomsoever granted, it is dedicated to a particular use, for the benefit of particular persons. That use is the *schools of the township;* and the persons to be benefited, the *inhabitants of the township* in which the lands are situated.

Historically, these several acts indicate the settled policy of the government since the period of the first reservation of the sixteenth section in 1785.

If, as counsel contend, the acts prior to 1816 be regarded only as an intimation of future policy; the act of 1816 the completion of that policy; and the act of 1828 simply nugatory; still the latter act, as a legislative exposition of what had been done, would seem to leave nothing wanting to demonstrate the settled purpose of congress in first *reserving* and subsequently *granting* the sixteenth section. The grant for the *schools* and the *inhabitants* of the township *exclusively*, stands unimpaired, and even fortified by that construction.

The purpose of the grant is still further elucidated by the second proposition in the sixth section of the act of *April*, 1816, *supra*. The salt springs out of which the saline fund arose, is granted to the *state, for the use of the people thereof.* This occurs in the very next sentence after the grant of the sixteenth section; clearly intending to distinguish between the *inhabitants* of the *townships* respectively, in the one grant, and the *people of the state at large*, in the other.

The obvious policy of such a grant may be suggested as an auxiliary consideration in favor of this construction. It was to encourage the settlement of all parts of the state, and thus secure the speedy disposal of the public lands. The same policy has since added the pre-emption laws. A supplemental and higher consideration was, no doubt, the diffusion of knowledge among the people, by laying the basis of a school fund uniformly, every six miles, throughout the state.

It will not be pretended that the sale of the school sec-

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

tion, with the consent of the inhabitants, under the direction of the legislature and the sanction of congress, changed the purpose of the grant. The terms upon which congress authorized the sale are too explicit to leave room for mistake. Act of *May*, 1828, *supra*. Instead of a trust estate, it became, by the sale, "trust funds." It is in this light that the new constitution (s. 7, art. 8, quoted in note 1, *infra*,) contemplates them as trust funds; and enjoins on the general assembly their faithful and exclusive application to the "purposes for which the trust was created."

Such being the history and purpose of the grant on the part of the *United States*, it is pertinent to inquire, in the next place, how the grant has been treated by the state of *Indiana*.

The convention that framed the constitution of 1816, for themselves and their posterity, accepted the propositions of congress. Among these propositions, we have seen, was the grant of the sixteenth section. They were accepted in the very terms of the grant, without any qualification whatever. 1 R. S. 95. This solemn ordinance would alone seem sufficient. It is consecrated by adherence to its terms for a period far beyond the generation that gave it birth. The men of that day seemed to have no idea that its solemn obligations would ever sit lightly on their posterity. There is no allusion to any such contingency. They made no provision for weighing fanciful considerations of expediency against the plighted public faith. To them belongs the honor of enjoining upon the general assembly "to provide by law for a general system of education, ascending in regular gradation from *township schools* to a state university, wherein tuition shall be gratis and equally open to all." Constitution of 1816, art. 9, s. 2.

Under this constitution and the laws made in pursuance of it, the school system was managed up to the taking effect of the school law of 1852.

The practical exposition of the grant by the state government for a period of over thirty-six years, can not fail to have its weight. During all that time the school section and the township fund arising from the sale of it, were

administered for the use of schools within the township, in accordance with the universal understanding of the terms of the grant. The purpose of the grant was repeatedly recognized by the assembly, often in the very language of the grant itself.

Without stopping to analyze all the state legislation on the subject, a few instances must suffice. Thus in *January*, 1828, the proceeds of the sale of the sixteenth section are directly recognized as "a school fund, *to be forever applied to the use of the inhabitants of the respective townships in the support of schools therein*," &c. A similar recognition is made in the school laws of 1831, 1833 and 1838. Further, the faith of the state is repeatedly pledged to the inhabitants of each township for the preservation of such of the funds belonging thereto as are controlled by the state, and for the payment of the annual interest thereon to the *townships properly entitled to receive the same*. R. S. 1831, p. 468.—Acts of 1833, p. 88.—R. S. 1838, p. 522.

From that period up to the session of the assembly of 1851–2, though the subject of diverting the fund was agitated, as we have seen, the whole tenor of legislation is a continued recognition of the rights of the inhabitants to the exclusive use of the congressional township fund. R. S. 1843, c. 13, art. 8, p. 253.—*Id.*, p. 261.

Even as late as 1849, when many radical changes were introduced in the mode of administering the trust, the township fund remained unimpaired. The legislature carefully guarded against any misconstruction as to the integrity of the fund. It is done in these memorable words, evincing a full knowledge of the history and purpose of the grant, as well as a just appreciation of the sacredness of the trust. "Provided, that nothing herein contained shall be so construed as to *divert* the fund commonly called the congressional township fund, or any part thereof, from the objects and purposes for which it was created by congress." Gen. Laws 1849, p. 125.

That recognition alone, thirty-three years after the grant, might, it should seem, suffice. Such intelligent appreciation of a public duty, in the administration of a public

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

trust, is grateful to contemplate. It outweighs a world of visionary theories which would place any fancied expediency above the public faith; or inaugurate a new era in education by an act which it is not easy to distinguish from a breach of public trust.

The executive officers of the government, under all the phases of the school law, recognized, within their proper spheres, the rights of the inhabitants to the income of the township fund.

Even the Courts added the weight of their authority in the same direction. "The grant," says judge *Sullivan,* "by the act of congress of 1816, of the sixteenth section, is not to the state, but to *the inhabitants* of the township in which the section lies." *The State* v. *Newton,* 5 Blackf. 455.

So in *Missouri.* In *The State* v. *Dent,* though the grant was to "the *state,* for the use of the inhabitants, for the use of schools," yet her own Courts regard the state as a mere trustee for the *inhabitants.* 18 Missouri R. 313. So, also, the same Court in *Butler* v. *Chariton County Court,* 13 *id.* 112.

A question somewhat similar came before the Supreme Court of *Ohio* in relation to what is called the "ministerial sections." In the sale of lands by the *United States* to the *Ohio Land Company,* and to one *Symmes,* section sixteen in every township was reserved for the use of schools, and section twenty-nine for the use of religion in the township. The sections thus reserved for religious purposes were denominated the "ministerial sections." It was held that the fund derived from the sale of the "ministerial sections" was intended for the support of religion in the *township in which the section was located; and could not be diverted to any other purpose, or for the support of religion in any other place.* The State v. The Trustees, &c., 11 Ohio R. 24.

In *Morton* v. *The Granada Academy,* it was held, that the school sections numbered sixteen are *trust property for the benefit of the whole township* in which they are situated; and that the legislature has no power to *divert* them from that purpose. 8 Smedes and Marsh. 773.

We are cited by the appellants to several decisions of the Supreme Court of *Illinois* for a different purpose, in regard to which we would be slow to admit the doctrine to the extent it is there pressed. But these very decisions are directly in point on the question we are now considering, viz., the power of the legislature to divert the fund. In *Bush* v. *Shipman*, it is held, that though the grant is to the *state* for the use of the *inhabitants*, &c., yet as a matter of good faith the effects of the township should be secured for the use of those for whom they were donated. 4 Scam. 186.

*Long* v. *Brown* is also cited to a point, (the title,) in which it is opposed by the authority of our own Court in 5 Blackf. 455, *supra*, and directly overruled in the *Vincennes University* case, 14 How. 268. But on the point we are now considering, it is good authority, and consistent with the case in *Howard*. It is there declared that the sixteenth section is held by the state in perpetuity for the use and benefit of the inhabitants of the proper township. 6 Alabama R. (New Series) 622.

On the same point, judge *McLean:* " The citizens within the township are the beneficiaries of the charity. The title to these lands has never been considered in the state; and it has no inherent right to appropriate them to any other purpose than for the benefit of schools. For the exercise of the charity under the laws, the title is in the township." *The Trustees of the Vincennes University* v. *The State of Indiana*, 14 How. 268.

The dissenting opinion of *Taney*, C. J., does not favor the diversion of the fund. " The reservation of the school sections undoubtedly dedicated them to the uses for which they were reserved; and they can not be appropriated by the state to any other purpose. But congress alone has the power to designate the body by whom the trust should be administered." 14 How., *supra*.

So that whether the one opinion or the other be adopted, the result is the same. Both agree that the fund can not be appropriated by the state to any other purpose; that

Nov. Term,
1854.

THE STATE·
v.
SPRINGFIELD
TOWNSHIP,
&c.

the trustee has no power to divert it from the specific purposes for which the trust was created.

The supervision exercised by the legislature over the township fund is but an implied necessity sanctioned by congress. It extends only to protecting and administering, not diverting, the fund.

It but remains to inquire, Does the school law of 1852 faithfully and exclusively apply that fund to the purposes for which it was created? We are clearly of opinion that it does not. The operation of the law is to distribute to the people of the state at large a school fund created for the exclusive use of the inhabitants of *Springfield* township.

To that extent the law is in violation of the seventh section of article eight of the constitution, and therefore void.

We have not been careful to inquire how far the school law of 1852 may conflict with the constitution of the *United States*. It is sufficient that it conflicts with the state constitution. The laws of congress have therefore been examined solely with a view to ascertain the intention of the grant.

It is urged that in most of the townships there were not at the time any *inhabitants*. But at common law, land may be granted to· *pious* uses before there is a grantee in existence competent to take. 14 How., *supra.—The Presbyterian Church, &c.*, v. *Williams*, 1 Ohio State R. 478. In the meantime, the fee will be in abeyance. *Story*, J., in *The Town of Paulet* v. *Clark*, 9 Cranch 292. These school lands donated to *charitable* uses fall within the same reason, and are governed by the same rule.

It is further insisted that the *congressional* townships were mere municipal corporations, existing at the will of the legislature; and that the act creating *civil* townships, with corporate powers, repealed by implication the former acts.

But even if this position were admitted, it is not perceived how it could inure to the benefit of the state, or give her any better right to divert the township fund. The

property of the deceased does not ordinarily fall to the
party who gave the fatal blow.   The artificial person cre-
ated by the state may have been brought to an untimely
end by the same power.   But the effects of the defunct
corporation do not thereby escheat.   The inhabitants still
remain.   They are "the beneficiaries of the charity."   The
grant once made to the inhabitants can not be invalidated.
It is a contract executed, which even the sovereign power
can not revoke.   *Fletcher* v. *Peck*, 6 Cranch 87.— *Terrett*
v. *Taylor*, 9 Cranch 43.— *The Town of Paulet* v. *Clark*, 9
Cranch 295.   Besides, by the act for the incorporation of
*congressional* townships, the general assembly vested the
lands, reserved by congress for the use of schools, in each
congressional township, *in the corporations thereof*.   R. S.
1824, p. 380.   She is therefore within the rule in *Cranch,
supra*, even if she ever had a shadow of title to dispose of.

Hence, admitting the demise of the corporations, the
state is not entitled to the school fund; nor released from
her duty as trustee to administer it faithfully and exclu-
sively for the benefit of the *inhabitants*.

So far as these corporations may have been invested
with political power or participated in the administration
of municipal affairs, the position of the appellants is un-
doubtedly correct.   The legislature could recall such power
at pleasure.   There is no vested right in corporate fran-
chises created for public purposes.   But so far as their
corporate capacity related to the fund of which the inhabi-
tants were the beneficiaries, it presents a very different
question.   To that extent they are, perhaps, embraced
within the rule in the *Dartmouth College* case, 4 Wheat.
518.   They would seem to be private corporations created
to meet the terms of the grant.   Acts of 1817, p. 104.—
Acts of 1818, p. 301.—R. S. 1824, p. 379.—R. S. 1831,
p. 463.—Acts of 1833, p. 78.—R. S. 1838, p. 509.—R. S.
1843, p. 306.

Since the state can not, in any event, divert the fund, it
would not become her, if she could, to repeal the corporate
powers of the inhabitants, and thus embarrass the admin-
istration of the school funds.   She would not thus need-

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

lessly compromise her dignity and good faith, by assuming a hostile and unnatural attitude to any portion of her citizens. She should rather confer on them increased facilities to administer their school funds efficiently.

It is urged in argument that the ruling indicated would be a deadly blow to the common school system of *Indiana*. We do not so regard it. We should be slow to believe that human ingenuity has been exhausted in the concoction of an unconstitutional enactment. However that may be, the responsibility does not lie with the judiciary. If the legislative department will impinge on the constitution, the duty of the Courts may be arduous and unpleasant, but it is a plain one, regardless of consequences.

As there are no disputed facts to be adjudicated, only the single question of law involved, we see no necessity for remanding the cause for further proceedings.

*Per Curiam.*—It is therefore ordered that the *Franklin* Circuit Court make the injunction granted in this cause perpetual.

*J. D. Howland*, for the appellants.

*G. Holland*, for the appellee.

(1) The following is the eighth article of the constitution in relation to "Education:"

"SECTION 1. Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the general assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all.

"SEC. 2. The common school fund shall consist of the congressional township fund, and the lands belonging thereto;

"The surplus revenue fund;

"The saline fund and the lands belonging thereto;

"The bank tax fund, and the fund arising from the one hundred and fourteenth section of the charter of the state bank of *Indiana;*

"The fund to be derived from the sale of county seminaries, and the moneys and property heretofore held for such seminaries; from the fines assessed for breaches of the penal laws of the state; and from all forfeitures which may accrue;

"All lands and other estate which shall escheat to the state for want of heirs or kindred entitled to the inheritance;

"All lands that have been, or may hereafter be, granted to the state, where no special purpose is expressed in the grant, and the proceeds of the sales

Nov. Term,
1854.

THE STATE
v.
SPRINGFIELD
TOWNSHIP,
&c.

thereof; including the proceeds of the sales of the swamp lands, granted to the state of *Indiana* by the act of congress of 28th *September*, 1850, after deducting the expense of selecting and draining the same;

"Taxes on the property of corporations, that may be assessed for common school purposes.

"SEC. 3. The principal of the common school fund shall remain a perpetual fund, which may be increased, but shall never be diminished; and the income thereof shall be inviolably appropriated to the support of common schools, and to no other purpose whatever.

"SEC. 4. The general assembly shall invest, in some safe and profitable manner, all such portions of the common school fund as have not heretofore been entrusted to the several counties; and shall make provision, by law, for the distribution, among the several counties, of the interest thereof.

"SEC. 5. If any county shall fail to demand its proportion of such interest, for common school purposes, the same shall be re-invested for the benefit of such county.

"SEC. 6. The several counties shall be held liable for the preservation of so much of the said fund as may be entrusted to them, and for the payment of the annual interest thereon.

"SEC. 7. All trust funds, held by the state, shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created.

"SEC. 8. The general assembly shall provide for the election, by the voters of the state, of a state superintendent of public instruction; who shall hold his office for two years, and whose duties and compensation shall be prescribed by law."

The twenty-second section of the constitution, so far as it relates to common schools, is as follows:

"SEC. 22. The general assembly shall not pass local or special laws, in any of the following enumerated cases, that is to say:

"Providing for supporting common schools, and for the preservation of school funds," &c.

The school law has been published in pamphlet form, with notes, &c., by the superintendent of public instruction. At page 26, the second section, embracing the consolidation feature, is thus introduced:

"SEC. 2. By this section, all common school funds, from whatever source derived, are consolidated in one general and common fund, to be called the 'common school fund.' The county officers need therefore no longer keep on their books the several classes of public funds distinct."

Then follows the act, the first four sections of which are as follows:

"An act to provide for a general and uniform system of common schools, and school libraries, and matters properly connected therewith.

"SECTION 1. Be it enacted by the general assembly of the state of *Indiana*, That there shall be annually assessed and collected, as the state and county revenues are assessed and collected; *first*, on the list of property taxable for state purposes, the sum of ten cents on each one hundred dollars.

"SEC. 2. The funds heretofore known and designated as the congressional township fund, the surplus revenue fund, the county common school fund, and all funds heretofore appropriated to common schools, the saline fund, the bank tax fund, shall, together with the fund which shall be derived from the sale of

the county seminaries, and the property belonging thereto, from the fines assessed for breaches of the penal laws of the state, and from all forfeitures which may accrue, all lands and other estates which shall escheat to the state for want of heirs or kindred entitled to the inheritance, all lands which have been or may hereafter be granted to the state, where no special purpose is expressed in the grant, and the proceeds of the sales thereof, including the proceeds of the sales of the swamp lands granted to the state of *Indiana* by the act of congress of 28th *September*, 1850, and deducting the expense of selecting and draining the same, the taxes which may from time to time be assessed upon the property of corporations for common school purposes, the fund arising from the one hundred and fourteenth section of the charter of the state bank of *Indiana,* and unreclaimed fees as provided by law, shall be denominated the common school fund, the income of which, together with the taxes mentioned and specified in the first section of this act, shall be applied to the support of common schools.

"SEC. 3. The several counties of this state shall be held liable for the preservation of said fund, and the payment of the annual interest thereon, at the rate established by law.

"SEC. 4. Each civil township in the several counties of this state, is hereby declared a township for school purposes, and the trustees of such township are hereby declared to be trustees also for school purposes, and their clerk and treasurer shall be the clerk and treasurer for school purposes also."

(2) This article is a literal copy, *mutatis mutandis,* of the prior act of congress of *February,* 1826, authorizing the state of *Ohio* to sell the school lands, and of the act of *March,* 1827, giving the same authority to *Alabama.*