# BUTLER, relator vs. CHARITON COUNTY COURT.

A became the purchaser of certain school lands in the county of Chariton:—he executed
  bonds for the purchase money, to the county for the benefit of the inhabitants of the
  township, in which the land lies.   On the 6th day of February, 1847, the General Assem-
  bly of the State, passed an act, which "authorised and required" the county court of
  Chariton county, to make an order rescinding the contract of sale to A, and to cancel the
  bond for the purchase money.   Held that the above act of the General Assembly is uncon-
  stitutional, and that the inhabitants of the township are entitled to the accrued interest
  upon the bond.

ERROR TO CHARITON CIRCUIT COURT.

DAVIS for plaintiff in error.

The only question presented by the record is, as to the power of the General Assembly of
Missouri to pass the laws for the relief of William Holland.   See session acts of 1846—7,
page 304.

It is insisted for the plaintiff, that the attempt to pass the law by the Legislature, was an
attempt to exercise judicial power, which, by our constitution, is confided to the courts.   See
the Constitution of Missouri, article 2nd; 1st sec. of article 3rd; 1st section of article 4th;
and 1st section of article 5th.

The power of cancelling a contract, is a power, in our State expressly given and confided to
the judicial department of the government, for causes shown, which, according to the rules
and usages of courts of chancery, will authorize it.   By whatever name the legislature may
call their action in behalf of William Holland; it is the exercise of judicial power; it is a
decree, cancelling the contract of a party without his being present to be heard, and cannot
have the force of a law.   See 16 Mass. Rep. 270; 15 do. 454; 8 Wheaton 84.

The title to the sixteenth townships of land in each township in Missouri, was vested in
the state, to and for the use and benefit of the inhabitants of each of said townships, for the
use of schools, by the act of Congress of the 6th of March, 1820, entitled "an act to authorize
the people of Missouri Territory to form a Constitution and State government, &c."   See Land
Laws, U. S. page 767.

The State of Missouri never owned the township school lands, except as a trustee for the
benefit of the inhabitants; and although she may do many things, as such trustee, it is con-
ceived she has no power to make a voluntary gift of said lands, or of the funds which arise
from the sale of them.

For all purposes in this proceeding, the sale of the land by the State to Holland, is to be
considered regular, and within the scope of her authority as such trustee; but having sold the
land at public sale to a private individual, in order to promote the objects of the grant, by the
general government, can she, by a special act of the Legislature, dispossess the purchaser
Holland, against his will and repay his money which she takes from the trustees of the town-
ship school funds, without impairing the obligation of a contract?   See 17th section of the
13th article of the Constitution of Missouri; 3 Story's Com. con. secs. 1379, 1385; 1 Kent's
Commentaries, Lecture 19 page 413 and 417.

The 1st section of the 6th article of the Constitution of Missouri, amongst other things
requires "that the General Assembly shall take measures to preserve from waste or damage,
such lands as have been or may hereafter be granted by the United States, for the use of schools

within each township in this State; and shall apply the funds which may arise from such lands, in strict conformity to the object of the grant. One school or more shall be established in each township as soon as practicable, where the poor shall be taught gratis." The General Assembly had power to sell, as this court has more than once decided, (8 Mo. Rep. 475, Pogne and Riggin vs. St. Louis county:) and in this case, eight years after the sale, upon the petition of the purchaser, and after he may have stripped the land of its fine timbers, its only valuable quality, this relief law is passed.

It is contended that the civil or congressional townships, as organized by the act of the General Assembly for school purposes, are not public corporations, created for the *mere* and *only* purpose of the administration of the government; for although education is enjoined as one of the concerns of government, and the case of the General Assembly is enjoined for the promotion of the schools ; and fines and forfeitures are appropriated by the State for the same object; yet the principle fund is not from the bounty of the State. The inhabitant of the township has a vested interest in those funds, votes his annual tax, helps to rear the school houses, and this relation is to be perpetual. See Rev. Statutes of 1835, title *scools and school lands*; Story's Com. on the Constitution, sect. 1387.

This Court has heretofore put salutary checks upon trivial objections to the payment of the purchase money, for school lands. See Bogart vs. Caldwell county, 9 Mo. Rep. 359.

As to this mode of proceeding on mandamus, then demurring and afterwards a writ of error. See 16th John. Rep. 61.

## CLARK and ABELL for defendant in error.

1. A proceeding by mandamus, is a remedy to compel an inferior court having jurisdiction of the subject matter to act in the premises, but not to correct the judgment of such inferior court after it has acted. 2nd. Bibb. 574; 10th Pick. 244.

2. The county courts have exclusive original jurisdiction in reference to the government of all school lands in the several school districts in the respective counties, and the sole control of the township school fund, and by the school law, have discretionary power to collect the same, or not as may be deemed best by the court, which will be seen by reference to the school law. The county court, having such power, the circuit court has no right to interfere, by mandamus, to control or govern that discretion. School Law, art. 2nd. secs. 9, 17, 18; Exparte Bassett 2nd. Cowen 458; Gray vs. Bridge, 11th. Pick. 189; 11th. Mo. Rep. 679.

3. It appears by the answer in this case, which is admitted to be true by the demurrer, that no application was ever made to the county court, by any authorized representative of the school district, to have the bonds collected, and the county court could not be regarded as neglecting its duty, in any view of the case, until a proper application was made by a proper person, and until it appeared clearly, that the money would be lost, unles such application was complied with.

4. The county court, in this case, however, acted in strict compliance with the laws of the State then in force. The Legislature had the power to order the contract recinded, and no one but the purchaser had a right to complain. The school lands were granted to the State, for the use of the inhabitants of each township for the use of schools. The people are soverign and have the right, through their agents, to manage and control these lands, in that manner, deemed by them best calculated to preserve the use of the lands or their proceeds to the inhabitants, according to the terms of the grant. In this case, a contract had been entered into for the sale of this land, but the purchase money not being paid, and the title not yet conveyed by the State having the same, her Legislature, by the consent of the purchaser, recinds the contract, surrenders up the bonds for the purchase money, holding the land for the use of the township, as it was before the contract was entered into.

We insist, that the State, by the passage of the two acts under which the county court acted

violated no principle of the constitution, or any vested right of any citizen or corporation; and we contend that the principles here advanced, are recognized and decided by this court in the case of Maupin vs. Parker, 3 Mo. Rep. 219, and in the case of Payne and Riggins vs. St. Louis county, 8 Mo. Rep. 473.

Judge BIRCH delivered the opinion of the court.

On the third day of September, 1839, William Holland became the purchaser of certin school lands, in township fifty-two of range eighteen, in Chariton county, for the sum of nine hundred and one dollars and sixty cents, and executed his bond to the county for the benefit of the inhabitants of the township accordingly. No question is made but that the sale was regular and valid, or that Holland is in any manner discharged from his liability, except that, by an act of the general assembly, approved February 5, 1847, the county court was "authorized and required to make an order rescinding the contract," and thereupon to cause the bond of Holland to be cancelled, and to charge no interest against him after the 3rd day of September, 1844. The county court having conformed its action to the legislative direction, the relator, who is the school commissioner for the township, filed his petition in the circuit court, praying such proceedings as might compel the payment of the interest due and accruing upon said bond. The circuit court having accordingly awarded a condition mandamus, and the county court having replied, and relied upon the statutory enactments alluded to, the question comes fairly enough before us upon the decision of the circuit court, overruling the relator's demurrer to the defendant's answer.

Regarding the legislative authority to authorise the *sale* of these lands, as falling within the doctrine of "*stare decisis,*" the proposition before us resolves itself into the simple enquiry, whether having done so, and the land having been sold accordingly, its agency did not therefore cease and determine? In this proposition will of course be involved the preliminary enquiry as to the character under which the State had jurisdiction of the question. Whether in virtue of its sovereignty as grantee, or as a mere intermediate fiduciary, or trustee of an expressed trust.

The language of the grant, it being the first of five propositions, which were submitted to Congress and accepted by the State, as an equivalent for suspending the power of taxing the public lands for five years, and certain military lands for three years, is in these words:

"*First.* That section numbered sixteen in every township, and when such section has been sold or otherwise disposed of, other lands equivalent

thereto, and as contiguous as may be, shall be granted to the State, *for the use of the inhab tants of such township for the use of schools.*"

Whilst it is conceded that the general government granted these lands, as well as others, for the equivalent alluded to, yet for what *purpose*, and as implying what duties, they were thus granted and accepted, would seem to be clearly enough denoted in the terms of the grant itself. To remove all doubt, however, we need but quote the language of the very next proposition, respecting the Saline lands, in these words:

"*Second.* That all salt springs, not exceeding twelve, with six sections of land adjoining to each, be granted to the said State *for the use of the said State,*" &c.

It must be obvious from the different phraseology adopted, that whilst the State had unrestricted authority to do with the Saline land money, whatever it pleased, and hence, of course, could *not* be considered as a trustee in relation to *that*, the *reverse* was purposely the case respecting the township school lands. They were granted to the *State*, to be sure, but distinctly as a *trustee*, to be dealt with "for the use of the inhabitants," including, of course, the children of the school township respectively. Hence the following cotemporaneous constitutional recognition of the *duty*, and as it seems to us, the whole duty of the *legislature*, in regard to them.

"Art. 6, sec. 1. Schools and the means of education, shall forever be encouraged in this State, and the general assembly shall take measures to preserve from waste or damage, such lands as have been, or may hereafter be granted by the United States for the use of schools within each township in this State, and shall apply the fund which may rise from such lands, in strict conformity to the object of the grant," &c.

It need scarcely be said, that the law under which these lands were sold, directed the application of the interest of the purchase money to the purposes of education in the township from whence it was derived. Having, therefore, embodied and presented the congressional, conventional and legislative provisions upon the subject, it would seem that, to combine and apply in a single paraphrase, at once, the essence of the grant, the requisitions of the constitution, the legislation which authorized the lands to be sold, and the rights and duties arising under that sale, would be to write it thus: "The United States has granted to the State of Missouri, for the use of the inhabitants of township 52, range 18, in Chariton county, for the use of schools in said township, the annually accruing interest upon the money arising from the sale of the 16th section of land contained therein, of which the proportion, to be paid

yearly by William Holland, is 90 dollars and 16 cents." The whole remaining question, therefore, is, had a subsequent legislature of the State, even as the accredited organ of its *will*, the *power* to divest the inhabitants of that township of the rights and benefits thus secured and accruing to them, or did not the authority of that body naturally and necessarily terminate with the sale of the land, and the remainder of the trust thenceforward devolve upon the township school authority and the courts? It seems to us that the question can admit of no other answer, than that the general assembly was as powerless, under the constitution of the United States, to impair or abrogate a contract thus concluded, or to interfere with rights thus vested, as it would have been to impair the obligation of any other contract, or divest a citizen or citizens of any other right.

That the case in question may or may not have been a hard one, invoking not merely proper personal sympathy and consideration, but even entitling the purchaser to the possible interposition of a court of chancery, need not of course be further speculated upon here, than as suggesting a recurrence to the judicial maxim, as old and even as honored as human nature itself, which is, that "hard cases sometimes make bad laws." Be this as it may, the judgment of the circuit court must be reversed, and the cause remanded for a peremptory mandamus, according to the alternate or ultimate prayer of the petition.