## EDWARDS *v.* JAGERS and Others.

In 1828 the legislature of *Indiana,* by law, constituted certain persons Seminary Trustees, for the county of *Switzerland*, for the special purposes in the act mentioned; among which were the selection of a site for a county seminary, the procurement of title thereto by donation or purchase, the solicitation of donations of lands, money, or property, to aid in the establishment of such a seminary, the preparation of a plan for the erection and management thereof, and to report their proceedings to the legislature.

In 1834 the legislature passed an act to incorporate the seminary, referring, in its preamble, to the former act, appointing trustees, and their report, and petition for a charter for said seminary, and the last-named act constitutes A, B, and others, and their successors in office, trustees of the *Switzerland County Seminary*, with power to sue and be sued, plead and be impleaded, answer and be answered unto, contract and be contracted with; to hold estates, real and personal, by gift, grant, contract, bequest, devise, or otherwise, and to all intents and purposes to be a body politic and

corporate; to have perpetual succession, to have a common seal, and the same to change at pleasure. It was, in said charter, made the duty of said trustees to erect and establish a seminary in said county, and conduct the same upon some approved plan, so as to secure to the greatest possible number of the children of said county, at the least possible expense, the advantages thereof. In April, 1834, C conveyed to said trustees, by way of donation, a site for said seminary, and said trustees erected and established the same thereon.

The Constitution of the State of *Indiana*, adopted in 1851, by sec. 2, of art. 8, provided for the sale of county seminaries, and the property held by them, for the purpose of organizing a general and uniform system of common schools, and the legislature, in 1852, in pursuance of said constitutional provision, enacted a law prescribing the manner in which said seminaries and property should be sold, and, in 1854, in the manner prescribed by said law, the *Switzerland County Seminary* was sold to D, who received a conveyance therefor, and instituted his suit for the possession thereof.

*Held*, that, by reason of the provision in the tenth section of the first article of the Constitution of the *United States*, prohibiting any State from passing any law impairing the obligations of contracts, the provision in the Constitution of the State of *Indiana*, authorizing the sale of said seminaries, and the law enacted in pursuance thereof, as to said *Switzerland County Seminary*, are unconstitutional and void, and that said purchaser acquired no title by said sale.

APPEAL from the *Switzerland* Circuit Court.

WORDEN, J.—Action by *Edwards*, the appellant, against the appellees, to recover possession of certain real estate.

Trial by the Court; finding, and judgment for the defendants.

In January, 1828, (see Acts 1828, p. 124,) an act was passed by the legislature of the State, appointing *Israel R. Whitehead*, and others named in the act, as Seminary Trustees for the county of *Switzerland*, for the special purposes provided for therein. Among other things, the trustees were to

select a site for a county seminary, and obtain, if possible, by donation, not less than an acre of land, to be used, occupied and employed by the inhabitants of said county for a county seminary; and, if no land can be procured by donation, then to procure the same by purchase; and, also, to ask for and receive all such donations of land, money, or property, as might be donated for the purpose of putting a county seminary in operation. The trustees were also to digest a plan of a building for a seminary, and the probable expense thereof, and such other matters connected therewith, respecting the raising of funds, and the pay of teachers, as their wisdom might suggest, and lay a full statement of the whole business before the legislature, with a petition for such a charter for a county seminary for said county, as they might deem proper. After the passage of this act, and before the act incorporating the seminary hereinafter mentioned, one John David Dufour, who was then the owner of the land in controversy, donated the same to the seminary, and executed a title bond therefor. Afterward, on the 1st of February, 1834, (see Acts 1834, p. 336,) an act was passed to incorporate the seminary. It recites, in the preamble, that "Whereas, the trustees of the Switzerland County Seminary, appointed by an act approved January 19th, 1828, have reported that, in pursuance of said act, they had located the site for said seminary, and have, in conformity to said act, prayed for a charter for said county seminary." It then enacts, that James Rous, and others, naming them, and their successors in office, are constituted and appointed trustees of the Switzerland County Seminary, with power to sue and be sued, plead and be impleaded, answer and be answered unto, contract and be contracted with; and hold estates, real and personal, by gift, grant, contract, bequest, devise, and otherwise, and, to all intents and purposes, to be a body politic and corporate; to have perpetual succession; to have a common seal, and the same to alter and change at pleasure.

The corporation, thus created, is, by the express terms of the law, made to succeed to all the rights, etc., of the trustees appointed under the act first above mentioned. The trustees, thus appointed and incorporated, were to hold their offices until the first Monday of March, 1834, at which time, and annually thereafter, one trustee, in each township in the county, was to be elected by the voters thereof, which trustees, when so elected, were to hold their offices one year, and until their successors were elected and qualified.

It was made the duty of the trustees to cause to be erected, on the site thus located, suitable buildings for the seminary, and prepare the institution, by adopting the manual labor, or any other valuable system of education, so as to admit, free of charge, or with the least possible expense, to the full enjoyment of the privileges of the institution, the greatest possible number of the children of said county, both male and female. Each township in the county was entitled to have a number of children taught in the seminary, proportionate to the population. It was also provided, that when the time should arrive when there should be more scholars than could be taught in the seminary, the trustees should fix some equitable rule for ascertaining, by lot, what particular scholars of those that should apply, should be preferred, so that each township that could furnish its quota, should have an equal proportion of scholars. The trustees were also required, as soon as practicable, to prepare a female department, in which female scholars might be taught, upon such regulations as might insure valuable instruction to the greatest number, at the least expense. The trustees were to elect, from their own body, a president, secretary, and treasurer, and keep a record of their proceedings. They were empowered to make by-laws and regulations for the government of the seminary, employment of teachers, and the transaction of business. They were also authorized to receive from the treasurer of State the proportion of all moneys that might be due to

the county seminary of *Switzerland* county. There was no reservation of a right to alter or amend the charter thus granted.

After the taking effect of this act, viz.: On the 18th of April, 1834, *Dufour* executed a conveyance of the premises to the trustees, for the use of the seminary.

Afterward, viz.: On the 3d of June, 1854, the auditor and treasurer of *Switzerland* county, in pursuance of an order of the board of commissioners of said county, previously made, due notice having been given, offered the premises at public sale, and *Edwards*, the plaintiff, became the purchaser, at the sum of one dollar and twenty-five cents, and received a conveyance.

The question arises, whether the sale and conveyance thus made, by the auditor and treasurer of *Switzerland* county, are valid, so as to vest the title in *Edwards*, or whether they are void?

The sale seems to have been made in accordance with the 8th article of the constitution of 1851, and a statute made in pursuance thereof. The constitution provides, that it shall be the duty of the general assembly " to provide, by law, for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all." That the common school fund shall consist, among other things, of " the fund to be derived from the sale of county seminaries, and the money and property heretofore held for such seminaries; from the fines assessed for breaches of the penal laws of the State; and from all forfeitures which may accrue." An act was passed in 1852, (1 R. S., 1852, p. 437,) to carry out this provision, authorizing the county auditor and treasurer, in each of the counties of the State, to sell the seminary buildings and other property, real and personal, belonging to the seminaries of their respective counties, and providing that the proceeds, after making certain deductions, should be placed to the credit

of the common school fund, to be disposed of in such manner as might be directed by law.

In the case of *The State* v. *Springfield Township*, 6 Ind. 83, it was held, that as section sixteen in each township was *granted to the inhabitants of such township, for the use of schools,* the school law, so far as it diverted the proceeds of said section from the proper township, and applied them to the use of the school system of the State at large, was a violation of the 7th section of the 8th article of the constitution of the State, which provides that, "All trust funds held by the State shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created." That case is not decisive of the present, though much of the reasoning is applicable here. The "trust funds" mentioned in section 7 of the 8th article were evidently not intended to include county seminaries, or money and property held for such seminaries; otherwise, the framers of the constitution could not, very consistently, have provided for a sale of the seminaries, and diverting the property thereof to a general and uniform system of common schools.

The Federal Constitution provides, that no State shall pass any law impairing the obligation of contracts, and the question is presented, whether the provision in our State constitution and the law made in pursuance thereof, authorizing the county officers to sell the seminary buildings and property, and apply the proceeds to the common school fund, are not, as far as the seminary in question is concerned, in violation of the Federal Constitution.

It may be stated, generally, that certain principles have been established by the Federal Supreme Court, in respect to the construction and effect of the prohibition upon the States, by which the State Courts are bound. That Court having paramount jurisdiction upon questions arising under the Constitution of the *United States*, we have only to ascer-

tain what has been determined, applicable to the case before us, and apply the doctrine accordingly. It has been determined, that an executed grant is as fully within the constitutional prohibition as an executory agreement. Hence, a conveyance which takes effect to transfer title, by delivery of the instrument, can not be revoked or impaired by State legislation. *Fletcher* v. *Peck*, 6 Cranch, 87, 136–139. The provision is not limited to dealings between individuals, but extends, equally, to contracts between State sovereignties and private parties; nor, in respect to contracts to which a State is a party, is it confined to such as relate to definite pecuniary obligations, or to specific real or personal property. It embraces charters and grants of corporate powers and privileges, when conferred for private and pecuniary objects. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. *Green* v. *Biddle*, 8 *Id.* 2. *Gorden* v. *The Appeal Tax Court*, 3 How. 133. *State Bank of Ohio* v. *Knoop*, 16 *Id.* 369. *Dodge* v. *Woolsey*, 18 *Id.* 331.

But the charter of the seminary in question, and the rights and duties arising within it, require some further examination. We think from the provisions of the charter, the institution may be properly denominated a *private eleemosynary* corporation. Angel and Ames on Corp., sec. 39. It is evidently not one of those public corporations, such as are instituted merely for political and municipal purposes, over which the legislature have entire control. In the case of *Dartmouth College* v. *Woodward, supra,* the Supreme Court say: "Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interest; but, strictly speaking, public corporations are such only as are founded by the government for public purposes, *where the whole interests belong also to the government.* If, therefore, the foundation be private, though under the charter of the government,

the corporation is private, however extensive the uses **may** be to which it is devoted, either by the bounty of the founder, or the nature or objects of the institution."

The Court still further say, "When the corporation is said, at the bar, to be public, it is not only meant that the whole community may be the proper objects of its bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control, and direct the corporation, and its funds and franchises, at its own good will and pleasure. Now, such an authority does not exist in the government, except where the corporation is, in the strictest sense, public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself. If it had been otherwise, Courts of law would have been spared many laborious adjudications in respect to eleemosynary corporations, and the visitorial powers over them, from the time of *Lord Holt* down to the present day."

The object contemplated by the charter in question was the education of the children in the county of *Switzerland*, and not the children of the State at large; the funds to support this object were to be derived from gifts, devises, etc., in pursuance of the terms of the charter, in connection with the funds to be received from the State as provided for. The State, by bestowing upon the corporation the seminary fund mentioned, must be considered, like other donors, as having made an endowment. But that gives her no more right to control the institution, than a donation by a third person would give him such right. By the terms of the charter, she relinquished all right, as a sovereign State, to control the institution, as she reserved to herself no such right. The corporation is, nevertheless, subject to the general law of the land. The trustees, in case of an abuse of the trust, fraud, or other grievance, may be reached through the medium of a Court of Equity. *Dartmouth College* v. *Woodward, supra.* It is no answer to this view to say, that by

the constitution of 1816, the moneys paid as an equivalent by persons exempt for military duty, and fines assessed for breaches of the criminal law, were to be applied to the support of county seminaries, and that, as the creation of this corporation was the means adopted to carry out the requirements in the county of *Switzerland*, the corporation should be regarded as a public State institution, subject to be controlled or destroyed by the legislature, and its property diverted to other purposes. Doubtless, the legislature might have created such a corporation as would have been, in the strictest sense, public, and subject to be controlled and destroyed by that body, and the property intrusted to it taken from it. But the question is, have they done so in this instance?

The case may be stated thus: the legislature created a corporation and authorized it to receive property to be used for, and applied to, a particular purpose. To that corporation *Dufour* made a donation of his land, to be applied, of course, to the purposes indicated by the charter. The State, by granting the charter, pledged its faith that it would not interfere with the trustees in the proper discharge of their duties as such; and there was an implied contract, between the donor and the corporation, that the property should be used only for the purposes indicated by the charter. An extract from the opinion of the Supreme Court, in the *Dartmouth College* case, will clearly elucidate this proposition. "By the terms of the charter," say the Court, "the trustees and their successors, in their corporate capacity, were to receive, hold, and exclusively manage, all the funds so contributed. The Crown, then, upon the face of the charter, pledged its faith that the donations of private benefactors should be perpetually devoted to their original purposes, without any interference on its own part, and should be forever administered by the trustees of the corporation, unless its franchises should be taken away by due process

of law. From the very nature of the case, there was an implied contract, on the part of the Crown, with every benefactor, that if he would give his money, it should be deemed a charity protected by the charter, and be administered by the corporation according to the general law of the land. As soon, then, as a donation was made to the corporation, there was an implied contract springing up, and founded on a valuable consideration, that the Crown would not revoke or alter the charter, or change its administration without the consent of the corporation. There was, also, an implied contract, between the corporation itself and every benefactor, upon a like consideration, that it would administer his bounty according to the terms, and for the object stipulated in the charter."

In any view of the case that presents itself to our minds, we can not distinguish it, in principle, from that of the *Dartmouth College*, and we must hold, in accordance with the doctrines of that case, that the charter of the seminary, and the rights accruing under it, are protected by the Federal Constitution, and that the provision in the State Constitution authorizing a sale of property, and the law made in pursuance thereof, must be held void as respects this seminary; and hence, that *Edwards* acquired no title by his purchase.

We may remark, before leaving the subject, that we lay no stress upon the fact that *Dufour* donated the land, instead of having sold it for a valuable consideration. A *sale* to a seminary, like the one under consideration, might be made on terms much more favorable to the corporation than would be made in ordinary dealings in real estate, with a view to aid and assist the corporation in establishing an institution of learning, while the vendor might not feel able or willing to donate the property. And in case of a sale, there would be the same obligation, on the part of the State, to permit it to be used for the purposes designated by the

charter; and the persons, for whose use it was purchased, would have a right equally as sacred as if it had been donated.

The language of the Supreme Court of the *United States*, in the case of *Terrett et al.* v. *Taylor et al.*, 9 Cranch, 43, is in point here. The Court say: "In respect to public corporations which exist only for public purposes, such as counties, towns, cities, etc., the legislature may, under proper limitations, have a right to change, modify, enlarge, or restrain them; *securing, however, the property for the uses of those for whom, and at whose expense, it was originally purchased.* But that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the State, or dispose of the same to such purposes as they may please, without the consent or default of the corporators, we are not prepared to admit. And we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and letter of the Constitution of the *United States*, and upon the decisions of most respectable tribunals, in resisting such a doctrine."

Whether the right to receive the seminary funds, mentioned in the charter, may or may not be withdrawn from the corporation, is a question we have not considered, and do not decide. But we hold that, without the fault of the corporation, its franchises can not be destroyed, or its property seized and sold, or diverted to purposes other than those contemplated by the charter.

That the sale was authorized by the new constitution of the State can make no difference in principle. The language of the proposition is, that no State shall *pass any law* impairing the obligations of contracts. The substance of this provision is, that no State shall interfere, in any way, with

the rights which citizens have acquired by contract. See the case of *Oliver Lee & Co.'s Bank,* 21 N. Y., p. 9; also, *Dodge* v. *Woolsey,* 18 How. 331. Indeed, a State constitution is but a higher grade of State *law* than that passed by the legislature, and can never be paramount to the Federal Constitution.

We have felt much reluctance in coming to the conclusion that a provision in our own constitution is void, as being in conflict with the Federal Constitution; but when we consider how much of the peace and happiness, liberty and prosperity of the people of this nation depends upon preserving the Federal Constitution intact, and free from the least infractions; and that it is the imperative duty of each State, as well as the Federal Government, to yield strict and implicit obedience to its behests, we can not but realize the fact, that we should be most recreant to the trust reposed in us, and to the duty which we owe to the country, and to ourselves, were we to suffer any considerations to swerve us from the discharge of our plain and unmistakable duty.

*Per Curiam.*—The judgment below is affirmed, with costs.

*H. W. Harrington,* for the appellant.

*A. C. Downey,* for the appellees.