**SIMPSON et al. v. PONTOTOC COMMON COUNTY LINE SCHOOL DIST. NO. 31 et al.	(No. 6846.) \***

(Court of Civil Appeals of Texas. Austin. June 6, 1925.)

**I. Counties ⬅107—Property of county for other than governmental purposes not subject to legislative control.**

Property of county held for other than strictly governmental purposes is not subject to legislative control, and the vested rights of beneficiaries of trust of which it is trustee are protected against impairment of contract under Const. U. S. art. 1, § 10, though the existence of the county itself is subject to such control.

**2. Constitutional law ⬅123—Grant of certain school lands to counties is "contract" within purview of Constitution denying impairment.**

Grant by state to a county of certain school lands being complete and executed is contract within purview of Const. U. S. art. 1, § 10, denying to the state power to pass any law impairing obligation of contracts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract.]

**3. Constitutional law ⬅123 — Impairment of contract granting school lands to counties on same footing as contract of individual.**

In applying prohibition of Const. U. S. art. 1, § 10, as to impairment of contracts, a voluntary grant by the state stands on no different footing than a similar grant by an individual.

**4. Constitutional law ⬅113—State may not impair obligation of contract through its Constitution.**

A state may no more impair the obligation of a contract through its Constitution than through legislative acts.

**5. Constitutional law ⬅113—When constitutional provision as to impairment of contract violated, stated.**

Provision of Const. U. S. art. 1, § 10, denying to the states power to pass any law impairing obligation of contract is violated whenever there is any invasion of the effect of asserted contract in however small a particular; it not being necessary that contract be entirely or even materially impinged upon.

**6. Schools and school districts ⬅15—Title to school lands vested in county as trustee for public school.**

Under Const. art. 7, § 6, the state grant of school land to a county became "of right" the property of that county with legal title vested therein, providing that such land, and proceeds thereof when sold, should be held by county alone as a trust for benefit of public schools therein.

**7. Schools and school districts ⬅15—Administration of county permanent school funds under legislative control subject to a trust.**

Administration of county permanent school funds arising from original four league land grants is subject to a trust for benefit of scho-

lastics of that county which cannot be diverted to other persons or beneficiaries, and within these limitations is under legislative control.

**8. Schools and school districts ⬅22—Special act creating county line school district held constitutional.**

Sp. Acts 38th Leg. (1923) c. 99, effective April 4, 1923, creating Pontotoc common county line school district No. 31 out of portions of Llano, Mason, and San Saba counties, although involving expenditure of revenue from county permanent school funds outside county limitations, *held* constitutional under amendment of article 7, § 3, proclaimed September 24, 1909, notwithstanding article 9, § 1; any inequality in per capita allotment of annual revenue from these funds being capable of future adjustment and protection.

**9. Constitutional law ⬅68(1)—Discretion of Legislature in creating county line school districts not subject to review.**

Discretion of Legislature in determining necessity for creating county line school districts under constitutional amendment of article 7, § 3, in order to increase facilities to scholastics affected, not subject to review except in case of palpable abuse.

**10. Schools and school districts ⬅22—Legislature may impose management of county line school district.**

Under constitutional amendment of article 7, § 3, the Legislature in creating county line school districts may impose on counties affected and their officers such additional duties and burdens as are essential in the proper organization, management, and control of these districts, notwithstanding article 3, § 56, and may impose the entire management of the district so created upon one county only.

**11. Schools and school districts ⬅22—Special act creating county line school districts held not unconstitutional for failure to provide equality of taxation.**

Objection that Sp. Acts 38th Leg. (1923) c. 99, creating county line school district, contravenes provisions of Constitution as providing no means reasonably sufficient to guarantee equality of taxation in such district, since property values within the counties affected are to be equalized by respective commissioners' courts, *held* not sustained, since Const. art. 8, § 18, expressly sanctions the method; any method more nearly approximating uniformity being matter for legislative discretion.

Appeal from District Court, Llano County; J. H. McLean, Judge.

Suit by Elmo Simpson and others against Pontotoc Common County Line School District No. 31 and others for a judicial decree. Suit dismissed on demurrer, and plaintiffs appeal. Affirmed.

F. J. Johnson, of Llano, and Will G. Barber, of San Marcos, for appellants.

Runge & Runge, of Mason, and C. D. Jessup, of Houston, for appellees.

McCLENDON, C. J.	The Thirty-Eighth Legislature, by special act effective April 4,

1923 (Acts 38th Leg. c. 99), created Pontotoc common county line school district No. 31 out of portions of Llano, Mason, and San Saba counties. Besides defining the boundaries of the district, placing its management under the jurisdiction of Llano county, and providing for the first election of trustees and other specified elections, not necessary to enumerate, the act applied the general laws of the state in regard to such districts to the government of the district. The boundaries of the district embraced all of Field Creek district No. 8 in Llano county, a prior district No. 31 in Mason and San Saba counties, and a part of Cold Creek district No. 24 in San Saba county; and the act abolished the first two districts named.

This suit was brought by a large number of plaintiffs made up of: (1) Resident citizens, qualified voters, and property taxpayers in Field Creek district and the portion of Llano county embraced in the Pontotoc district; (2) parents of children of scholastic age residing in the portion of the district in Llano county; (3) minors within the scholastic age residing in Llano county and Field Creek district; and (4) two regularly elected trustees of Field Creek district whose qualification and action as such the act prevented. The defendants were the Pontotoc district and its trustees and the judge and commissioners of Llano county. The relief sought was a judicial decree:

(1) Declaring void and dissolving the Pontotoc district.

(2) Enjoining (a) the exercise of any office or function, (b) the assessment or collection of any tax, and (c) the issue of any bonds or other obligations under the act.

(3) Authorizing the Field Creek district to exercise its duties, powers, and privileges, and the defendant trustees thereof to qualify as such.

There was also a prayer for general relief.

The trial court sustained a general demurrer to the petition; and plaintiffs declining to amend, the suit was dismissed. From this judgment the plaintiffs have appealed.

The first question which plaintiffs present in their petition, and the one upon which the greatest stress is laid, is that the special act creating the district is void in that its necessary effect is to divert the proportionate part of the school fund derived from Llano county school lands to which the Llano county scholastics residing in the district are entitled. The petition alleges, in this connection, that the four leagues of school land allotted to Llano county have never been sold, that such lands are now reasonably worth $500,000, that the present annual revenue therefrom amounts to more than $5 per capita to the scholastics living in the county, and that this value and per capita revenue will increase; whereas, the school lands of Mason and San Saba counties have been sold, the former for $13,260, and the latter for $100,000,

the annual revenue from the funds thus created only amounts to 50 cents and $1 per capita for the Mason and San Saba county scholastics respectively, and these principal sums and per capita amounts will not increase. The necessary effect of the act, it is claimed, will be to place the revenues from these funds in one general fund for maintenance of all the schools to be shared in equally by all the scholastics in the district, to the detriment of the scholastics of Llano county. It is further contended that at least a part of these revenues will necessarily be expended in support of a school or schools outside the county to which it belongs, and that this also will constitute an unlawful diversion of such fund.

Appellants' first seven propositions, which raise these contentions, and their supporting authorities, follow:

[1] "1. While the very existence of a municipal corporation (such as a county) is subject to legislative control, yet its property, owned or held for other than strictly governmental purposes, is not so subject, and even more clearly is it fundamentally true that the vested rights of beneficiaries of a trust, of which it may be trustee, are protected by the guaranty of the United States Constitution against impairment of contracts. Milam County v. Bateman, 54 Tex. 153; Galveston Co. v. Tankersley, 39 Tex. 651; State of Indiana v. Springfield Township, 6 Ind. 83; Davis v. Indiana, 94 U. S. 792, 24 L. Ed. 320; Butler v. Chariton County Ct., 13 Mo. 112; Town of Milwaukee v. City of Milwaukee, 12 Wis. 93; Grogan v. San Francisco, 18 Cal. 612–614; Montpelier v. East Montpelier, 29 Vt. 12, 67 Am. Dec. 748; Mt. Hope Cemetery v. Boston, 158 Mass. 509, 33 N. E. 695, 35 Am. St. Rep. 515, and note at 531; Spaulding v. Andover, 54 N. H. 38; Greenville v. Mason, 53 N. H. 515; Plymouth v. Jackson, 15 Pa. 44; 12 C. J. 1003, § 623; Id. 1006, § 628; 15 A. & E. Enc. of Law, 1046–1049; Abbott's Mun. Corp. vol. 1, §§ 96–97; Id. vol. 3, §§ 935–936; Dillon's Mun. Corp. (4th Ed.) §§ 66–68.

[2] "2. The grant by the state of Texas to Llano county of the four leagues of school land, being complete and executed, became and is a contract within the purview of article 1, § 10, of the United States Constitution, denying to the states power to pass any law 'impairing obligation of contracts.' Milam County v. Bateman, 54 Tex. 153; Galveston Co. v. Tankersley, 39 Tex. 651; Terrett v. Taylor, 9 Cranch, 43, 3 L. Ed. 650; Pawlet v. Clark, 9 Cranch, 292, 3 L. Ed. 735; Dartmouth College Case, 4 Wheat. 697–698, 4 L. Ed. 629; Graded School v. Trustees, 95 Ky. 436, 26 S. W. 10; R. C. L. vol. 6, p. 338, § 331.

[3] "3. In applying the prohibition of the United States Constitution as to impairment of contracts, a voluntary grant by the state stands on no different footing than a similar grant by an individual. Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440; In

re Malone's Estate, 21 S. C. 435; Grammar School v. Bailey, 62 Vt. 467, 475, 20 A. 820, 10 L. R. A. 405, and note; Edwards v. Jagers, 19 Ind. 410; State v. Whitney, 66 Wash. 473, 120 P. 116; State v. Board, 183 Ala. 565, 567, 63 So. 76; State v. Westerfield, 23 Nev. 468, 49 P. 119.

[4] "4. A state may no more impair the obligation of a contract through its Constitution than through legislative acts. Wright v. Giles, 60 Tex. Civ. App. 550, 129 S. W. 1168; Grigsby v. Peak, 57 Tex. 149; Vorhies v. Mayor, 70 Tex. 339, 7 S. W. 679; Gunn v. Barry, 15 Wall. 623, 21 L. Ed. 212; White v. Hart, 13 Wall. 652, 20 L. Ed. 685; Railroad Co. v. McClure, 10 Wall. 515, 19 L. Ed. 997; U. S. v. Jefferson Co., Fed. Cas. No. 15,472, 1 McCrary, 362; Edwards v. Jagers, 19 Ind. 410; Wade on Retroactive Laws, 53, 56; 12 C. J. p. 988, § 595; Elliott on Contracts, § 2717; R. C. L. vol. 6, p. 331, § 323.

[5] "5. The cited provision of the United States Constitution is violated whenever there is any invasion of the effect of the asserted contract 'in however small a particular,' and it is not required that the contract be entirely or even materially impinged upon. Story on the Constitution, vol. 2, § 1385; Sutherland's Stat. Const. § 474; Planters' Bank v. Sharp, 6 How. 327, 12 L. Ed. 447; Green v. Biddle, 8 Wheat. 2, 5 L. Ed. 547; Winter v. Jones, 10 Ga. 190, 54 Am. Dec. 379.

[6] "6. By virtue of the provision of the state Constitution of 1876, the four leagues of land became 'of right' the property of Llano county, with legal title vested in it, but with provision that 'said lands and the proceeds thereof, when sold, shall be held by said counties alone as a trust for the benefit of the public schools therein'; *and the reasonable, natural and necessary result of the facts alleged in plaintiffs' original petition is to divert part of this fund belonging to Llano county from the 'public schools therein,' and to apply same to education of children of Mason and San Saba counties.* (Emphasis ours.) Constitution of Texas 1876, art. 7, § 6; State of Indiana v. Springfield Township, 6 Ind. 83; Butler v. Chariton Co. Ct., 13 Mo. 112; Graded School v. Trustees, 95 Ky. 436, 26 S. W. 10; People v. Board, 13 Barb. (N. Y.) 400; Gordon v. Cornes, 47 N. Y. 608; Board of Education v. Bakewell, 122 Ill. 339, 351, 10 N. E. 378; Halbert v. Sparks, 9 Bush (Ky.) 259; State v. Westerfield, 23 Nev. 468, 49 P. 119; Otken v. Lamkin, 56 Miss. 758; Davis v. Indiana, 94 U. S. 792, 24 L. Ed. 320; Springfield Township v. Quick, 22 How. 68, 56 L. Ed. 16.

"7. The effect of the grant to Llano county of the four leagues of land, when read in connection with section 6, art. 7, of the Constitution of the state, was (as to said lands and all income therefrom) to make same of right (1) the property of said county as distinct from the state, (2) a trust fund for

benefit alone of the public schools to be conducted in that county, and (3) for benefit only of scholastics residing within Llano county. Board of Trustees v. Webb County (Tex. Civ. App.) 64 S. W. 486; Elwood v. Stallcup, 57 Tex. Civ. App. 347, 122 S. W. 906; Parks v. West, 102 Tex. 11, 111 S. W. 726; Comanche County v. Burks (Tex. Civ. App.) 166 S. W. 470."

With the exception of the underscored portion of appellants' sixth proposition, these propositions from 1 to 7 inclusive are well supported by authority and are sustained. The history of the four-league county land grants and their legal status are set forth in Milam County v. Bateman and the other Texas cases cited. It will not be necessary to restate these matters, as the effect of these grants as deduced from the adjudicated cases is very accurately and tersely expressed in these propositions.

On June 11, 1908, the Supreme Court held that the Legislature was without power, under the constitutional provisions then in force, to create school districts out of territory comprising more than one county. Parks v. West, 102 Tex. 11, 111 S. W. 726. In order to meet this constitutional inhibition, the next session of the Legislature submitted an amendment of article 7, § 3, the pertinent portions of which read:

"The Legislature may also provide for the formation of school districts by general or special law, without the local notice required in other cases of special legislation; and all such school districts, whether created by general or special law, may embrace parts of two or more counties. And the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts, and for the management and control of the public school or schools of such district, whether such districts are composed of territory wholly within a county or in parts of two or more counties."

This amendment was adopted at an election held August 3, 1909, and so proclaimed on September 24, 1909. From that date it has constituted a part of the organic law of the state. An enabling act was later passed authorizing the creation of county line districts under general law, under which many such districts have been created. The Legislature has also created quite a number of such districts by special act. Altogether, we understand there are several hundred county line districts in the state.

Whatever may be said regarding the wisdom of creating school districts out of territory of more than one county, it cannot be seriously questioned that the people of the state have the power to determine this matter of public policy, and to confer upon the Legislature the authority which this amendment in clear and unequivocal language confers. The amendment did not merely remove the constitutional restrictions upon this character of legislation, but conferred an ex-

press grant of power to do the thing which the Constitution had theretofore inhibited.

Complete statistics regarding the county land grants are not available, but we gather from such sources as are readily accessible that all but 18 of the 253 counties in the state received their quota of these lands. The last report of the superintendent of public education covering these grants (1904–06) shows that the grand total of the permanent fund of the counties was then $7,395,049.01, of which $1,825,559.62 was in lands and $5,-569,489.39 in bonds, other securities, and cash. It appears from this report that at that time a large number of the counties had disposed of all their lands, and many others had disposed of portions of them. The permanent fund, whether in lands or the proceeds thereof, varied in the several counties from $3,925.27 to $125,000. Where the fund still consists of lands there has been, no doubt, a vast enhancement in value therein since the date of this report, dependent upon the location of the lands, their quality, etc. It would be safe to assume that no case can be found where the per capita allotment of the annual revenues from this fund to scholastics in adjoining counties would be exactly the same.

It is not seriously questioned by appellants that in so far as the inequality in these per capita allotments is concerned, adjustments might be made so as to give to those entitled to the greater per capita the benefit of the excess. The contention, in this regard, is that no provision to that end has yet been made, either in the act in question or in the general law upon the subject, and that the act creating the district is therefore totally void. With this contention we cannot agree.

In the first place we are not prepared to hold that under the ample powers given the trustees of the district in regard to the establishment, maintenance, and control of the schools therein, the benefit of this excess might not be provided for in the way of a longer school term for the scholastics entitled to such excess. But even were there no means under present statutes of effecting such equalization, we do not think the act creating the district would therefore be void. Any attempt at an unlawful diversion of the fund or any part thereof may be prevented by appropriate legal action, and such portion of the fund so sought to be diverted thereby protected and held until such time as legal means for its use in behalf of the beneficiaries were provided.

If the county permanent school fund furnished the only means for the support of our public schools, there would be much more of substance in appellants' contention. But not only is this not the case, but these funds, even under the most favorable circumstances, do not and cannot be relied upon to furnish more than a small portion of the amount required for this purpose. The $4.50 per capita excess of the Llano over the Mason fund is only about one-third of the per capita apportionment from the state permanent school fund. In addition, other maintenance funds are provided by general taxation such as one-fourth of all state occupation and poll taxes and an ad valorem tax of not exceeding 35 cents on the $100 valuation, which may be, and often is, supplemented by legislative appropriation. These various sources of revenue are in many instances found or considered insufficient and are increased by local taxation. One of the primary purposes of creating school districts is to provide for such local taxation.

The fostering of public education has always been regarded in this state as one of the most important functions of government. The Texas declaration of independence recites, among the grievances against the Mexican government, that—

"It has failed to establish any public system of education, although possessed of almost boundless resources (the public domain), and although it is an axiom in political science, that unless a people are educated, it is idle to expect the continuance of civil liberty, or the capacity of self government."

This pronouncement regarding public education was later carried into the organic law of the republic and state, and the Legislature is enjoined "to establish and make suitable provisions for the support and maintenance of an efficient system of public free schools."

[7] The land grants to the several counties, first of three leagues and later of four, constituted the first substantial provision for the support of the public free schools. It may be conceded that in making these grants the county was expected to constitute the unit in the educational system of the state. But the fund thus created—whether so regarded at the time is unimportant—has proved grossly inadequate to meet the increasing demands made necessary by ever changing conditions in the state, and it could not seriously be contended that it was contemplated by these grants to prevent the people of the state from adopting, from time to time as changed conditions or experience might dictate, different methods of effecting the educational advancement of the state. The most that can be said in this regard is that the grants created a trust fund for the benefit of the scholastics of the county which could not be diverted to other purposes or beneficiaries. The administration of the fund, within these limitations, is subject to legislative control.

[8, 9] What has been said applies equally to appellants' contentions that the fund must be expended within territorial limitations of the several counties, and that the expenditure of any portion thereof in the

maintenance of a school located beyond the boundaries of the county to which the fund belongs constitutes, as a matter of law, an illegal diversion thereof. It is conceivable that a school might be so located as to effectuate a substantial deprivation to some scholastics of their interest in the fund. But such is not the necessary or even probable result of county line districts, and the same result is conceivable in districts located wholly within a county. The purpose of the constitutional amendment in authorizing county line districts was no doubt to bring larger benefits and increased facilities to the scholastics affected; and it is peculiarly a legislative function, in creating such districts, to determine whether these worthy objects will be thereby accomplished. The discretion of that body is not subject to review, except, perhaps, in case of palpable abuse. The number of schools in the district and their location is left to the discretion of the district trustees, with the right of appeal to the county and state school authorities. In a proper case, no doubt, final control of this discretion is with the courts. Caswell v. Fundenberger, 47 Tex. Civ. App. 456, 105 S. W. 1017. The effect of appellants' contention that no part of the fund could be expended to support a school outside the county owning the fund would not only be to invalidate practically every county line district in the state, but also to render it impossible to legally establish such districts except in those rare instances where the counties involved had no permanent school fund—a result certainly not in contemplation in creating the fund.

We overrule appellant's contention that the act is unconstitutional in that its necessary effect is an unlawful diversion of the revenue derived from the Llano county permanent school fund.

Appellants' eighth proposition reads:

"Under section 1, art. 9, of the Constitution, no part of a county may be detached therefrom and attached to another county without previous favorable vote of a majority of the electors of both counties; and if such may not be done for all county purposes, then it may not be done (as here) for one or more of such purposes. Article 9, § 1, Texas Constitution 1876; Turner v. Tucker (Tex. Sup.) 258 S. W. 149."

We are unable to find any substantial merit in this proposition. Article 7, § 3, of the Constitution is a complete grant of power within itself and contains express limitations upon legislative authority respecting matters of taxation, requiring, in this regard, the approval of the qualified taxpaying electors in the district. The Legislature is given express power to create school districts, whether or not wholly within a county, by general or special law. Had it been intended that the approval of the electorate should be necessary to make effective the legislative will in this regard, language would

have been employed in the amendment to express that intention. There being no such limitation contained in the grant, we see no force in the contention that the provisions of article 9, § 1, of the Constitution, which were in effect at the time the amendment was adopted, have any application whatever to the amendment. The proposition is so plain as to be self-elucidating.

[10] Appellants' propositions 9 and 10 question the validity of the act in that it places the entire management of the district upon Llano county and imposes extraterritorial duties upon its judge, sheriff, commissioners, and other officers in violation of article 3, § 56, of the Constitution. These propositions are not briefed and in our opinion are not well taken. The amendment authorizing the creation of county line districts either by general or special law necessarily carries with it the power to create the machinery by which such districts, when created, may function as such. It would not be practical to divide the responsibility of managing them between two or more counties and their officials, and we see no valid obstacle to the plan which the Legislature has adopted. The larger portion of the duties connected with the district are upon its local trustees. The duties imposed upon the managing county and its officers are no different from those they would be required to perform were the district composed only of the portion of its territory in Llano county. Whatever additional burdens the act may impose by reason of the territory outside of that county arise solely from an increase in volume of such duties as the county and its officers would otherwise be charged with, as regards the territory of the district within the county. This increase is probably of no great import. However, and aside from this fact, the amendment we think carries with it the implied power to impose upon the counties whose territory is affected, and their officers, such additional duties and burdens as the Legislature may deem essential in the proper organization, management, and control of these districts.

[11] Appellants' eleventh proposition is as follows:

"Said act provides no means reasonably sufficient or adequate to guarantee uniformity and equality of taxation thereby authorized in the district formed, and is, accordingly, in contravention of the provisions of the Constitution of Texas requiring taxes to be equal and uniform."

This proposition is based upon the assertion that since property values in those portions of the district lying within the several counties "are to be equalized by the commissioners' court of the respective counties, then we have no guaranty of uniformity, because it will involve the act of three different boards," and that the standards by which these boards fix or equalize the val-

ues will not be uniform. ' The law requires that property be assessed at its full value, and the machinery provided for equality and uniformity is the county equalization board. Exact equality and uniformity in taxation is probably unattainable under any system that may be devised. The achievement of this very laudable consummation is one of the most troublesome problems with which governments have to contend. The Constitution in dealing with this subject provides (article 8, § 1) that taxes shall be equal and uniform, and in section 18 of the same article constitutes the commissioners' courts of the several counties boards of equalization for the attainment of this end. All ad valorem state taxes are equalized in this and no other way. The Constitution which establishes the principle of equality and uniformity in taxation therefore expressly sanctions this method of its accomplishment. It may be true that it would more nearly approximate uniformity and equality, in the local taxation imposed by these districts, to provide for district boards of equalization (and the Legislature has so provided as regards certain classes of districts. See R. S. art. 2861, as amended by chapter 35 of the Laws of 1923, 2d Called Session, p. 78); but, if so, the matter is one which addresses itself to legislative discretion and not to the courts. It might be burdensome and cumbersome to require separate boards in all county line districts, and there may be other important considerations which would render their requirement in every case ill advised. We overrule the contention.

Finding no error in the trial court's judgment, it is affirmed.

Affirmed.