## LONG & LONG v. BROWN ET AL.

1. A Court of Equity will not interfere between the parties to a contract, though it be executory, where no fraud has intervened, but will leave them to seek the redress their contract provides for, unless there be some special ground of equitable interposition—as where in a sale of land the covenants are independent, and the vendor cannot make the title and is insolvent.

2. An allegation that the complainant has reason to fear, and does fear, that the defendant cannot make title, and will be unable to respond in damages, is too vague, loose, and uncertain to be the basis of any action in a Court of Chancery.

3. It is no ground for granting or continuing an injunction to a judgment at law that there is a mistake in the description of lands in a bond for title, without also showing that the other party, on application, refuses to correct the mistake.

4. In such a case, the correction can be made by the adult parties, though infants have an interest in the title bond.

5. The grant of sixteenth sections, by the act of Congress of second March, 1819, is in perpetuity to the inhabitants of the several townships, but the legal title to the land is in the State, in trust for the inhabitants of the respective townships in which the lands lie.

6. A sale of a sixteenth section, pursuant to the act of the Legislature is valid, and binding on the inhabitants of the township.

7. Whether the acquiesence of the inhabitants of a township in an irregular sale, and receipt of the interest of the purchase money, would not be a waiver of such irregularity—and whether the issuance of a patent would not preclude all inquiry into the regalarity of the sale—*Quere*.

8. Affidavits cannot be read on a motion to dissolve an injunction, in opposition to the answer, except in the case of an injunction to stay waste.

9. An injunction may be dissolved on the answer of one defendant, if he alone is charged with knowledge of the facts.

APPEAL from the Chancery Court at Talladega.

The bill was filed by the plaintiffs in error, and alledges that they purchased of the defendant, Brown, the sixteenth section, in township nineteen, range six, east—the north east quarter of the north east quarter and the south east quarter of the north east quarter of section seventeen, in the same township and range, all in the Coosa land district, at the price of six thousand dollars, to be paid in three payments, and executed to him three notes for two thousand dollars each, falling due annually, on the 25th December, 1840, 1841, and 1842—he exe-

cuting a bond for title, by which it was intended to secure to complainant good and perfect titles to said land, including relinquishment of dower, upon the payment of the purchase money.

That in describing the land in the title bond, either by fraud or mistake, the south east quarter of the north west quarter of section seventeen, is inserted, instead of the south east quarter of the north east quarter of that section, and that the land so purchased and not conveyed is essential to the enjoyment of the residue.

That at the time of the purchase they were informed by Brown that said sixteenth section had been regularly sold under and by authority of the statute authorizing such sales, and that he would be able to make good and perfect title to the same, "but your orator, after diligent inquiry at the proper office, and of many persons who had opportunity to be correctly informed on the subject, cannot learn of any evidence that will sustain the legality of such sale. On the contrary they believe said sale was irregular and void, and that many of the material requisitions of the statute authorizing such sales, were not complied with.

That a mill was erected on a part of the land, and defendant assured complainants that the works were executed in a workmanlike manner, and that the abutments of the dam were run into the bank for its security—but that such was not the fact, and that the tenons of the works were not more than from two to four inches, when they should have been from six to eight inches, in such works, and that complainants had no power to correct these misstatements, as the parts were invisible. That the dam has been washed away by a freshet.

That N. & H. Weed & Co. of Philadelphia, as indorsees of the first note, have commenced suit thereon, and obtained judgment thereon, and that it was not till judgment was obtained that complainants learned that they were like to lose the land from the inability of defendant to make title. That the most valuable part of the land was entered at the land office by one Price, who has departed this life without making defendant any title, and that his widow refuses to relinquish dower but on certain conditions, which they do not know that the defendant can perform. That execution has been sued

out on the judgment, and suit brought by Weed & Co. on the second note. That they have reason to fear, and do fear, that defendant will be wholly unable to make them title according to his contract, and they fear he will be unable to respond to them in damages. Notwithstanding all which, the parties are urging the collection of the money, &c.

The prayer of the bill is, that Brown and N. & H. Weed & Co. be made parties to the bill, and for an injunction, &c.

The Chancellor granted the injunction, according to the prayer of the bill.

Annexed, as an exhibit to the bill, is the title bond of Brown, the condition of which is, "Now be it known, that when said J. & J. Long shall well and truly pay and satisfy said notes, then the said Warner Brown binds himself, his heirs, &c., to convey, by general warranty deed, the above described land, and bargained premises, to the said John and James Long, or their heirs, and also, to procure the relinquishment of his wife, then this obligation to be void, else to remain in full force."

To this bill the defendant, Brown, answered, admitting the sale of the land, as stated in the bill, and the mistake as stated, but says that the title bond was drawn by one of the complainants—that he was never advised of the mistake until the filing of the bill, and would at any time, if applied to, have corrected it. That in regard to the sixteenth section, he has no recollection of making the statements attributed to him, but may have done so, and avers that the sale was regular, so far as he knows or believes, and has heard no complaint, and avers that no difficulty can arise as to the title. He denies all fraud or misrepresentation in regard to the title or the nature or value of the improvements, but that the whole matter was fully known and understood, and minutely examined and discussed between the parties before the purchase.

He denies that the widow of Price claims dower in the land, and states that she is willing to make title to the land on the payment of the purchase money, which he will be prepared to make when it falls due. He denies that he is unable to respond in damages, if necessary, but avers his ability. He also exhibits his titles to the land in controversy.

Upon this answer the Chancellor dissolved the injunction,

and refused to permit the complainant to read affidavits in support of the bill.

From this decree the Chancellor granted an appeal on condition that the complainants executed a refunding bond within twenty days. The bond was not executed until after the expiration of the twenty days.

The plaintiffs now assign for error—

1. That the Chancellor erred in dissolving the injunction.

2. In hearing the motion, when all the parties had not answered.

3. In refusing to hear affidavits in support of the bill.

RICE, for the plaintiff in error, contended, that there was no authority for selling the sixteenth sections, and that the sale was absolutely void. He maintained that the grant from Congress to the inhabitants of the township, created a corporation by implication, and that the subsequent assent by Congress to the State Legislature to sell the sixteenth sections, was a mere void act—and that if it were not, the consent of the *inhabitants* was not obtained by getting the consent of a majority of the voters of the township. And that as the defendant could never make title to the land, he should not be permitted to collect the purchase money, which he might not be able to refund. He contended that an allegation of fraud was not necessary to sustain such a bill as the present.

He cited 4 Wheaton, 629; 2 B. Com. 317; 3 Ala. Rep. 51; 7 Cranch. 164; 9 id. 43; 4 Wheaton, 518; 1 Sumner's C. C. R. 277; 9 Porter, 577; Bl. Com. 483, note; 3 Ala. 169; Tomlin's Law Dic. Title Inhabitant.

He maintained that the mistake gave a Court of Chancery jurisdiction, and that it could only be rectified in Chancery, as the heirs of Long, one of the vendees, had an interest in it.

STONE, contra.

ORMOND, J.—The plaintiffs in error purchased from the defendant, Brown, a large tract of land, composed in part of a sixteenth section, and upon which there was a mill erected— the purchase money was to be paid in three instalments, which were secured by promissory notes, the vendor executing a bond

with condition to make title to the land on the payment of the purchase money. The notes were transferred to the defendants, N & H. Weed & Co. who brought suit on the note first falling due, and obtained a judgment, to enjoin which this bill was filed.

The bill seeks to enjoin the collection of the purchase money, on the ground of fraudulent representations in relation to the workmanship of the mill dam—because of a mistake in the bond for title of one of the parcels of the land which was essential to the enjoyment of the residue—and because of the alledged inability of the vendor to make title.

All the allegations of fraud are distinctly and positively denied in the answer, and it is insisted that the plaintiffs purchased with full knowledge of all the facts—that in regard to the mistake in the title bond, the defendant, Brown, never knew of it until the filing of the bill, and is now, and would at all times have been willing to correct it—that as it respects the title to the land, he believes that he will be able to make a good and sufficient title according to his contract—or will be able to respond in damages.

The bill states that the plaintiff in error sold one half of his interest in the land to one William F. Long, and made an indorsement to that effect on the bond for title, and it is now contended that as William F. Long has died, his heirs have such an interest in the bond, that the mistake can only be corrected in a Court of Chancery. Mistake is one of the heads of Chancery jurisdiction, and there can be no doubt that a Court of Equity would rectify the mistake in this case; but there is neither reason or propriety in seeking the expensive aid of that Court, to do that which the vendor was willing to do voluntarily. To give a Court of Equity jurisdiction to enjoin a judgment at law, until a mistake of this kind could be rectified application should have been made to the vendor to make it, and on his refusal, that Court would interfere, if necessary, to prevent an injury from that cause. No application for its correction was made in this case, or information given that the mistake existed. There was therefore no reason either for granting, or continuing the injunction for that cause.

If it be true as stated, that minors are interested in this title bond, it is not easy to see how they could be prejudiced by

the correction of a mistake. A decisive answer, however, to the objection that the mistake could not be corrected without the interposition of a Court of Equity is, that it is a question in which the minors alone have an interest, and they could not be prejudiced by such a course, as they would not be concluded by the alteration, if fraudulently or improperly made by the adult parties to the contract.

In respect to the allegations of the bill of the inability of the vendor to make titles to the land, it is to be observed that a Court of Equity will not interfere between the parties to a contract, although it be executory, where no fraud has intervened, but will leave them to seek that redress for its violation which, by their contract they have stipulated for, unless there exists some special ground for the interposition of a Court of Equity. Thus, Chancery will interpose where the covenants entered into by the parties are independent, and the vendor cannot make or obtain the title, and is *insolvent.* The ground of its interposition in such a case, is to prevent the irreparable injury which would result from the payment of the purchase money, to one who could not respond in damages for the breach of the contract on his part.

The allegations of this bill fall far short of these requisitions. The question as to the ability of the vendor to make title to the sixteenth section will be hereafter considered, and in regard to the other portions of the tract, it is not sufficiently alledged that the vendor cannot make the title, or that failing in that he is unable to respond in damages. The allegation is, that they (the complainants,) "have reason to fear, and do fear, that said Warner Brown is and will be wholly unable to make them title according to his contract, and they also fear he will be unable to respond to them in damages." Allegations of this loose and indeterminate character, are wholly insufficient to warrant the interposition of Chancery. There is no sufficient allegation of the insolvency of the vendor, and the allegations of the inability of the vendor to make or procure the title, are too loose, vague and uncertain to be the basis of any action in a Court of Chancery. So far as they are susceptible of being answered they are all denied.

In relation to the sixteenth section, which constitutes a considerable portion of the land purchased, it is supposed that the

vendor never can make a good title; because, first, there was no power to sell the land, existing either in the Legislature or in the township, and that the sale was therefore a nullity ; and, secondly, if such power existed it was improperly exercised, as the act of the Legislature did not require the assent of all the *inhabitants* of the township.

From the vast number of sales which have been made under the sanction of this law, this question is invested with great interest, and has received our deliberate consideration.

The propriety of reserving a portion of the public land, out of the extensive domain from which new States were in future to be created, as the means of providing a perpetual fund for the purpose of education, early received the attention of our wisest statesman. The first time they were called to legislate upon the lands ceded by the States, was in the establishment of the "Ordinance for the government of the territory of the U. States north west of the river Ohio, in 1787. They declared by the third article of that celebrated instrument, that "Religion, morality and knowledge, being necessary to good government, and the happiness of mankind, *schools and the means of education shall be forever encouraged.*" At the same time, whilst authorizing the Treasury to contract for the sale of the western lands, they required the lot No. 16, in each township to be given in perpetuity for the purposes contained in the Ordinance. [1 vol. Land Laws, 361, 362.]

By the fifth clause of the first article of "The Articles of Agreement and Cession between the U. States and Georgia," in 1802, by which the United States acquired the right to the territory now composing the States of Alabama and Mississippi, it was declared that the territory thus ceded should, when sufficiently populous, form a State, and be admitted into the Union " with the same privileges and in the same manner as is provided in the ordinance of Congress of 13th July, 1787, which ordinance shall in all its parts extend to the territory contained in the present act of cession, that article only excepted which forbids slavery.

The act of Congress of 2d March, 1819, for the admission of Alabama into the Union, declares, "that the section numbered sixteen in every township, and when such section has been sold, granted or disposed of, other lands equivalent thereto,

and most contiguous to the same, shall be granted to the inhabitants of such township for the use of schools."

This grant by Congress cannot properly be called a donation; it was the performance merely of a solemn obligation created by the compact with Georgia, and was intended as a grant to the State, to be held in perpetuity for the use and benefit of the inhabitants of the township.   The legal title to these lands, could not vest in the inhabitants of the township, as they had no corporate existence, nor could such a capacity be conferred on them by the act of Congress; and it is very certain was not intended to be conferred.   Nor can any doubt be entertained that the legal title was intended to be vested by the act of Congress in this State, and did so vest, by the acceptance of the conditions proposed by the act of 2d March, 1819, by the convention of this State, in August of the same year.

By the acceptance of this trust, the State impliedly stipulated to do those acts which were necessary to give full effect to the grant, and this trust it has faithfully executed.   As early as 1819 agents were appointed to take care of the lands, and subsequently school commissioners were appointed, and trustees required to be elected by the township for the management of the sixteenth section in each township, who were declared a body corporate.

As the land in its wild state was of no benefit to the people of the township, and as a revenue could only be derived from it by cultivation, the lands were leased under suitable provisions to preserve them from waste.   It was soon, however, discovered that this process would end in the destruction of the land; every where the sixteenth section was in a state of ruinous dilapidation.   In this condition of things, application was made to Congress, by the Legislature of this State, for leave to authorize the sale of the sixteenth section, by the assent of the township, which was granted—the proceeds of the sale to be invested in some productive fund.

We agree entirely with the counsel for the plaintiff in error, that this act conferred no power ; nor had Congress any right whatever to interfere in the matter.   It is, however, evidence of the strong desire of the Legislature to act in good faith, and to keep within the pale of the law.   Having thus obtained the assent of Congress, the Legislature passed an act authorizing

the sale of the sixteenth section in each township, with the *assent of the inhabitants*, the proceeds to be placed in one of the Banks of the State, and to carry interest at the rate of six ·per cent per annum, payable quarterly, and secured to the people of the *township* whose lands were thus sold.

It is very clear that power must exist somewhere to control the subject of the grant, so as to make it subserve the purpose it was designed for. The State very properly supposed that this power was lodged with the inhabitants of the respective townships ; a majority were therefore authorized to act, and if in their opinion a sale of the land was advisable, to make sale thereof. The whole scope and design of the law is merely to give the assent of the State to such sale, and by providing the necessary machinery to carry out in action the wishes of the township, and at the same time afford the inhabitants a guaranty, that the principal of the proceeds of such sale should be forever kept inviolate, for the benefit of posterity, and the annual interest only be consumed by the existing generation.

The act authorizing these sales, passed in 1828, requires the assent of the inhabitants of the township to such sale, to be ascertained by taking the vote of the qualified electors resident in the township, a majority of whom voting in the affirmative was necessary to a sale. It is denied by the counsel for the plaintiff in error, that the assent of a majority of the *electors*, of the township, is the assent of a majority of the *inhabitants*, which term he insists means householders, and includes females as well as males. [Tomlin's Law Dic. Title, Inhabitant.]

The popular meaning of the term *inhabitant* is, a resident or dweller in a place, in opposition to a mere sojourner or transient person: [1 Bouv. Law Dic. 504 ; Webster's Dic.] and such, beyond all doubt, was the meaning of the act of Congress. In this sense then, the aggregate mass of the people, men, women and children, *resident* in the township are the *inhabitants* to whom this grant is made in perpetuity. How then is the land to be sold and converted into money, if it becomes obvious that a sale is necessary to prevent the destruction of the fund ; must the assent of every one of the inhabitants be obtained, as a prerequisite; or may not the assent of a majority of those to whom, from their sex and age, the politi-

cal interests of the country are confided, be considered as a fair exponent of the wishes of a majority of all the *inhabitants?* We are of that opinion ; to obtain the assent of all, or even the opinion of all, would be impracticable.

It is the established law, that in the case of a corporation aggregate, the opinion of a majority binds the whole, and it is quite obvious, from the diversified opinions of men on all subjects, that in all matters in which the entire mass are interested, the majority must govern the minority; and were it otherwise, civil government would be at an end. From the necessity of the case, therefore, a majority of the inhabitants must be permitted to act for all ; and we think the Legislature acted wisely in considering that the consent of all the inhabitants might be fairly implied from the consent of a majority of the qualified electors, as it is impossible to suppose that the interest of a majority of the qualified electors of any township, is not identical with the interest of a majority of the *inhabitants* of the same township.

We are therefore clearly of opinion, that the grant of sixteenth sections is in perpetuity to the inhabitants of the respective townships—that the legal title to the land is in the State, in trust for the inhabitants of the respective townships, in which the land is situated—and that a sale of the land, pursuant to the act of the Legislature is valid and binding on the inhabitants of the township.

We are not called on in this case, to determine whether the sale of the sixteenth section in this instance was regular ; or if irregular, whether such defect was not waived by the township if it acquiesced therein, and received the interest of the proceeds of the sale—or, lastly, whether all inquiry into the regularity of the sale would not be concluded by the issuance of the patent.

It was not improper to entertain the motion to dissolve the injunction, on the answer of Brown alone, as there is no allegation in the bill that the other defendants have any knowledge whatever of the facts constituting the supposed equity of the bill, and, indeed, the contrary is shown by the bill itself.

Nor did the Court err in refusing permission to the plaintiff in error to read affidavits in support of the bill. It is perfectly well settled, both in England and this country, that, upon a

motion to dissolve an injunction, affidavits cannot be received, either to support or contradict the answer, with the single exception of *waste*, where the injury would be irreparable. All other cases are provided for in this State by the bond of the defendant, which will be a sufficient guaranty. [8 Vesey, Jr. 35; 1 John. Ch. 211, 444; 2 id. 202.]

Let the decree of the Chancellor dissolving the injunction be affirmed.