# The State *v.* Board of School Commissioners of Mobile County.

## *Bill to Annul Lease and to Enjoin Waste.*

(Decided June 30, 1913.   63 South. 76.)

1. *Public Lands; School Lands; Grant to State.*—The provisions of the act admitting Alabama to the Union granting certain lands for school purposes known as the 16th section lands, was not a donation to the state, but the fulfillment of an agreement between the state of Georgia and the Federal government by which the lands were ceded to the Federal government, and which agreement provided that the provision of the ordinance governing the Northwest Territory should apply to such lands.

2. *Same; Effect of Grant to State.*—As the inhabitants of the township were not incorporated, the title to the 16th section land could not vest in them, but vested in the state for their use and benefit, which trust the state accepted.

3. *Same.*—After the acceptance of the trust by the state Congress had no further right to interfere in the control of the 16th section land, and its act authorizing the sale thereof conferred no additional power upon the legislature with respect thereto.

4. *Same; Lease by State.*—Since the statute of limitations applies to actions to recover the 16th section lands, and since they can be sold with the consent of the inhabitants, there can be no question that they can be leased in accordance with the provision of the statute.

[The State v. Board of School Commissioners of Mobile County.]

5. *Same.*—The local and general laws of Alabama with regard to the 16th section land have committed to the agents or officers appointed or elected as provided by law, entire management and control of those lands, and such boards or officers may lease them for the purpose of turpentining the trees and removing the timber therefrom.

5. *Same; Pleading; Construction Against Pleader.*—Where the bill to cancel leases does not affirmatively show that the consent of the inhabitants to a lease of 16th section lands was not given, such consent will be presumed, if it be conceded that the acts of Congress and the state statutes require such consent.

6. *Evidence; Judicial Knowledge.*—The courts cannot judicially know whether or not the consent of the inhabitants of a certain township to the sale or lease of school lands had been ascertained or given since the admission of the state, under any of the various statutes governing such lease or sales.

7. *Statutes; Construction; Contemporaneous Construction.*—Where the proper construction is in doubt the contemporaneous construction placed thereon by the court, and by officers whose duty it was to construe it, should be regarded in determining the proper construction.

APPEAL from Mobile Chancery Court.

Heard before Hon. R. T. ERVIN, Special Chancellor.

Bill by the State of Alabama against the Board of School Commissioners of Mobile County to annul certain leases, to enjoin waste and for other purposes. Decree for respondent on demurrer, and complainant appeals. Affirmed.

The following is the decree of the chancellor:

"The bill joins as respondents the school board, the individual members thereof, and those who have been members of this board for some time past, with various other parties to whom it is alleged leases have been given by such board authorizing such parties to box for turpentine and to cut the timbers from the sixteenth section and the lands given in lieu of such section. It alleges that the leases are void and give no rights to the lessees to box or cut the timber, as the school board was without authority to execute such leases. It prays that the school board may be enjoined from executing any additional such leases, and that those which have been

[The State v. Board of School Commissioners of Mobile County.]

executed may be canceled and surrendered, and that the members of the board who were such when these leases were executed and the parties who held such leases may be required to account for the damage done by boxing or cutting or removing the timber. It will be observed that the bill makes no charge that any commissioner acted in bad faith or profited in any way from or by these leases, nor is it alleged that the commissioners knew when such leases were made that they had no right to make them. The demurrers raise a number of questions, many going to the technical sufficiency of the bill, while others go to the merits, and without undertaking to point out specifically I am of the opinion that many of them are good. There are no facts alleged showing that the board has under contemplation the making of any other such leases; certainly the court cannot assume that the board will make such leases, when it is informed that its power to so lease is questioned. I do not, therefore, consider the bill good as seeking to enjoin the making of other leases. Under the allegations of the bill it would appear that, even if the school board had no right to make the leases in question, they were made by such board under the bona fide belief that they had such right. In passing upon the leases when acting in good faith, the members of the board were acting judicially, and I do not consider them personally responsible in damages for such an honest mistake in judgment, and I therefore consider that under the allegations of this bill the members of the board, both past and present, are not liable. There being no allegation of anything received by the individual members of the board, there is no equity in the bill for an accounting against them. There can be no equity for an accounting against the board where there is no allegation of misappropriation of funds received by it;

besides, this board is only a state agency to handle and disburse the school funds. As a bill to restrain impending work, there are no allegations either as to the board or its members, past or present, which give it equity as such. I fail to find any allegation giving it equity against the board, past or present, as a bill to administer a trust, and I therefore consider the bill to be multifarious in so far as it joins the board of commissioners or its members, past or present.

"This brings us down to the question of whether there is any equity under the allegations of this bill to cancel the lease as a cloud on the state's title. It will, of course be conceded that if the leases were authorized then the bill is wanting in equity. All controversies involving the legal title to lands belong properly to the jurisdiction of courts of law, and are more properly tried by a jury. Hence it is only when it is necessary to prevent fraud or irreparable injury that a court of equity will intervene to prevent a sale of land under judicial process, issuing from the courts of law. No special equity existing, the parties must be remitted to a court of law for the determination of questions of law. *Caldwell v. Lawler,* 70 Ala. 295; High on Injunction, 267. A bill cannot be filed to remove a cloud on the title when the alleged cloud is a deed void on its face, or based on a judicial sale under a void judgment or decree. *Calwell v. Lawler, supra; Smith v. Gilmer,* 93 Ala. 226, 9 South. 588. The test of whether a cloud exists is, Would the party be required to offer evidence in support of his title? *Torrent F. Co. v. City of Mobile,* 101 Ala. 563, 14 South. 557. The bill alleges that the leases are void. Assuming this to be true, if the state sue one of the lessees for the alleged trespass, would it be required to offer any evidence to show such lease to be void? I think not. If such lease is void for want of

authority in the school board as alleged, then, when the lessee sought to show his authority for his acts, the court will hold same to be void for want of authority in the board, and no evidence will be required on the part of the state in question. The affirmative would be on the lessee to show a lease from some one authorized to execute it, and this he could not do, so I find no equity in the bill to remove the cloud.

"This leaves only one question, Can the bill be maintained to require all the alleged lessees to respond in a court of equity for alleged trespasses made by them on the school lands? Under the facts alleged in the bill, and under the authorities in this case, I do not consider that in the multiplicity of suits there is a sufficient independent equity to be invoked by the state to authorize this bill. *Jones v. Hardy.* 127 Ala. 221, 28 South. 564; *Turner v. City of Mobile,* 135 Ala. 73, 33 South. 132; *Roanoke Guano Co. v. Saunders,* 173 Ala. 347, 56 South. 198, 35 L. R. A. (N. S.) 491; *So. Steel Co. v. Hopkins,* 174 Ala. 465, 57 South. 11, 40 L. R. A. (N. S.) 464."

R. C. BRICKELL, Attorney General, R. B. EVINS, and LEIGH & CHAMBERLAIN, for appellant. The legal title to the lands on which the trespasses are alleged to have been committed is in the state, and the state has a right to bring this action.—*Long v. Brown,* 4 Ala. 629; 49 Ark. 172; 36 Cyc. 907; 49 South. 611; 58 South. 1033. There is nothing in the proposition that the bill is multifarious.—*M. & P. Line v. Wagner,* 71 Ala. 571; *Long v. K. C. M. & B.,* 54 South. 62. The fact that the suit is against the board does not make it a suit against the state.—29 Cyc. 1441. The constitutional inhibition against the state being made a party defendant is for the benefit of the state, and can be waived by the state.

—*Comer v. Bankhead,* 70 Ala. 493; *Ex parte McDonald,* 76 Ala. 603; 36 Cyc. 915. The bill has equity as a bill for the cancellation of leases made by the Board of School Commissioners.—*Borst v. Simpson,* 90 Ala. 373; *Smith v. Pearson,* 24 Ala. 355; *Eufaula N. Bank v. Pruitt,* 128 Ala. 470. If the conveyances are void on their face, equity would still have jurisdiction because of the irreparable injury alleged.—*Caldwell v. Lawler,* 70 Ala. 293; *Lyon v. Hunt,* 11 Ala. 309; *Ninninger v. Norwood,* 72 Ala. 277; 26 S. W. 271. These same authorities establish the equities of the bill as a bill for injunction.—*Wilson v. Myer,* 144 Ala. 405; *Burden v. Stein,* 27 Ala. 104. The bill is maintainable as a bill for an accounting.—1 Cyc. 424, 426-7-8; *Avery v. Ware,* 57 Ala. 475. The bill has equity because filed in the administration and enforcement of a trust.—*Long v. Brown, supra;* 39 Cyc. 588-591; 89 N. E. 973; *V. & A. M. Co. v. Hale,* 93 Ala. 542. The bill presents a case of equitable cognizance as preventing a multiplicity of suits.—1 Ark. 282; 32 Am. Dec. 689; 6 Johns. Ch. 139; *Morgan v. Morgan,* 3 Stewart 383; *Bolman v. Lohman,* 74 Ala. 510; *Kennedy v. Kennedy;* 2 Ala. 609; *Fleming v. Gilmer,* 36 Ala. 67; 70 Miss. 182; *Peters v. Rhodes,* 157 Ala. 25. Courts of equity will enforce statutory penalties along with the claim for damages.—*Chandler v. Crawford,* 7 Ala. 510; *Cobia v. Ellis,* 149 Ala. 108; *Gulf C. Co. v. Jones,* 157 Ala. 32; *State v. McBride,* 76 Ala. 51; 108 U. S. 436; 16 Cyc. 77.

"The general rule is, that when equitable jurisdiction attaches for a rightful purpose, the Court will retain it, and proceed to settle and adjudicate all matters in controversy, granting complete relief, though it may involve the adjudication of purely legal questions."— *Boyd v. Hunter,* 44 Ala. 705; *Stow v. Bozeman,* 29 Ala. 397; *Chose v. Brighton,* 93 Mich. 285; *Pioneer Sav.*

& L. Co. v. Garrett, 20 Tex. Civ. Ap. 111; Con. Ins. Co.
v. Garrett, 125 Fed. 589; Clark v. White, 37 U. S. (12
Pet.) 178; U. C. Life Ins. Co. v. Phillips, 102 Fed. 19;
Griffin v. Griffin, 163 Ills. 216; U. S. v. Gaylord, 79 Fed.
21; Pack v. Tie Co., 116 Fed. 273; Brown v. White, 39
Fla. 102; Watson v. Watson, 45 W. Va. 290.

GREGORY L. & H. T. SMITH, and HANAW & PILLANS,
for appellee. The state can never be made a party de-
fendant.—Comer v. Bankhead, 70 Ala. 495; Sec. 14,
Constitution 1901, 1 Peters 110; Ala. G. I. S. v. Reyn-
olds, 143 Ala. 579; Holmes v. State, 100 Ala. 291; 12
Am. Dec. 153; White v. Ala. I. Hospital, 138 Ala. 479.
The authorities cited by appellant do not bear out the
assertion that the state may be sued by consent.—Au-
thorities supra. The board was fully authorized to do
the things complained of.—Acts 1853-4, p. 190; Acts
1855-6, p. 148. If the act of the Board was unauthor-
ized then the action should be against those who en-
tered and cut the trees and not against the Board.
The bill was not good as a bill for discovery.—Shackel-
ford v. Bankhead, 72 Ala. 476; Continental L. I. Co. v.
Webb, 54 Ala. 689; Guice v. Parker, 48 Ala. 616. The
foundation of appellant's case rests upon the assump-
tion that the restriction upon the state's power of sale
rests upon the consent of the inhabitants of the town-
ship and deprives the state, however acting, of all
power to lease, etc. If the state had no power of dis-
position the statute of limitations could not run, and
the opinion in the case of State v. Sadie Schmidt, is all
wrong.—State v. Schmidt, in MSS. No title ever vests
in the lessee under the lease, but only the privilege of
removing the turpentine and timber within a given
time.—Zimmerman M. Co. v. Daffin, 143 Ala. 383.
Hence, the lease was not a sale of any interest in the

land.—*Millikin & Co. v. Carmichael,* 139 Ala. 228; 105 Fed. 941; 196 Fed. 767. The authority to lease is conferred by section 1803, Code 1907, which is vested in the Superintendent of Education. By the act approved Dec. 13, 1836, The Commissioners of Mobile, were empowered to do the particular thing here complained of. Counsel cite other statutes bearing on this subject, but it is not deemed necessary to here set them out.

MAYFIELD, J.—This is a bill in equity by the state against the board of school commissioners of Mobile county, as a corporation, against each present and each ex-member, individually, and against scores of persons to whom the present board and past boards have made leases of the sixteenth section school lands of Mobile county for the purpose of turpentining and removing timber therefrom. The theory of the bill is that these leases are void because unauthorized by law, and that the lessees, acting under the leases, have committed, are committing, and will continue to commit waste as to these school lands by denuding them of their valuable pine timber and taking the turpentine therefrom. The bill seeks to cancel the lease contracts and to enjoin the alleged waste, and seeks a decree against members of the board and the lessees for damages suffered on account of such waste already committed. The respondents, as a board, and various individuals, as defendants, demurred to the bill for want of equity and for various other grounds, such as multifariousness, as for misjoinder of parties and of suits, and for failure to allege facts sufficient to authorize the bill as one for an accounting or one to prevent a multiplicity of actions at law. The special chancellor sustained the demurrer as for want of equity and on several special grounds mentioned above, as shown by his opinion on file, which the

reporter will set out, and which will elucidate the issues raised, and make certain the questions decided by him and by us on this appeal.

The fundamental question for decision on this appeal is whether the leases in question are valid or void. If valid, and the board is authorized to make other similar leases, then it is conceded that there is and can be no equity in the bill, and there is no necessity to pass upon other questions raised and insisted upon. If, however, the leases are unauthorized and void, then it will be necessary to pass upon the other questions.

No one of the many leases is set out in full or in part, and no particular irregularity or insufficiency is set out or relied upon; no bad faith is alleged on the part of the board as a unit, or on the part of any individual member in general, nor as to any particular lease. The allegation and insistence is that the board had no authority of law to make the leases, that their acts in the matter were on account of mistake of the power and authority conferred by the Legislature.

The position of the state's counsel is that the lands in question were granted by act of Congress to the state in trust for the use and benefit of the inhabitants of the respective townships, and that, by the condition of that trust, the trustees could not sell the lands except by the consent of the majority of the inhabitants of the respective townships, and that the trustee, the state, had not authorized, and could not by an act authorize, a sale in violation of the trust imposed by the act of Congress granting the lands, and that the leases in question were, in law and in fact, sales of such lands, or of estates or interests in them, without the consent of the inhabitants and in violation of the trust imposed upon the lands.

183.]     OF ALABAMA.     563

[The State v. Board of School Commissioners of Mobile County.]

These or similar grants by Congress of sixteenth section and indemnity in lieu of sixteenth section lands have been before the state and federal courts for construction, and they have not always received a uniform construction as to the nature and the conditions of the grants and of the trusts imposed, in so far as the relation of the respective states to the inhabitants of the respective townships were concerned.

In the early case of *Long & Long v. Brown et al.*, 4 Ala. 622, wherein the history of these grants in this state is given, it was said by this court (and it is now applicable to the instant case) that: "In relation to the sixteenth section, which constitutes a considerable portion of the land purchased, it is supposed that the vendor never can make a good title, because, first, there was no power to sell the land existing either in the Legislature or in the township, and that the sale was therefore a nullity, and, secondly, if such power existed it was improperly exercised, as the act of the Legislature did not require the assent of all the *inhabitants* of the township.' From the vast number of sales which have been made under the sanction of this law, this question is invested with great interest, and has received our deliberate consideration.

The propriety of reserving a portion of the public land out of the extensive domain from which new states were in future to be created, as the means of providing a perpetual fund for the purpose of education, early received the attention of our wisest statesmen. The first time they were called to legislate upon the lands ceded by the states was in the establishment of the "Ordinance for the Government of the Territory of the United States Nortwest of the River Ohio in 1787." They declared by the third article of that celebrated instrument that "religion, morality, and knowledge being

necessary to good government and the happiness of mankind, *schools and the means of education shall be forever encouraged."* At the same time, whilst authorizing the treasury to contract for the sale of the western lands, they required the lot No. 16 in each township to be given in perpetuity for the purpose contained in the ordinance. Vol. 1, Land Laws, 361, 362.

By the fifth clause of the first article of "the Articles of Agreement and Cession between the United States and Georgia" in 1802, by which the United States acquired the right to the territory now composing the states of Alabama and Mississippi, it was declared that the territory thus ceded should, when sufficiently populous, form a state, and be admitted into the Union "with the same privileges and in the same manner as is provided in the ordinance of Congress of 13th July, 1787, which ordinance shall in all its parts extend to the territory contained in the present act of cession, that article only excepted which forbids slavery."

The act of Congress of March 2, 1819 (chapter 47, 3 Stat. 491, §6), for the admission of Alabama into the Union declares: "That the section numbered 16 in every township, and when such section has been sold, granted, or disposed of, other lands equivalent thereto, and most contiguous to the same, shall be granted to the inhabitants of such township for the use of schools." This grant by Congress cannot properly be called a donation; it was the performance merely of a solemn obligation created by the compact with Georgia, and was intended as a grant to the state to be held in perpetuity for the use and benefit of the inhabitants of the township.

The legal title to these lands, could not vest in the inhabitants of the township, as they had no corporate existence, nor could such a capacity be conferred on them

by the act of Congress, and it is very certain was not intended to be conferred. Nor can any doubt be entertained that the legal title was intended to be vested by the act of Congress in this state, and did so vest, by the acceptance of the conditions proposed by the act of March 2, 1819, by the convention of this state in August of the same year. By the acceptance of this trust the state necessarily stipulated to do those acts which were necessary to give full effect to the grant, and this trust it has faithfully executed. As early as 1819 agents were appointed to take care of the lands, and subsequently school commissioners were appointed, and trustees required to be elected by the township for the management of the sixteenth section in each township, who were declared a body corporate.

As the land in its wild state was of no benefit to the people of the township, and as a revenue could only be derived from it by cultivation, the lands were leased under suitable provisions to preserve them from waste. It was soon, however, discovered that this process would end in the destruction of the land; everywhere the sixteenth section was in a state of ruinous dilapidation. In this condition of things, application was made to Congress by the Legislature of this state for leave to authorize the sale of the sixteenth section by the assent of the township, which was granted—the proceeds of the sale to be invested in some productive fund.

We agree entirely with the counsel for the plaintiff in error, that this act conferred no power; nor had Congress any right whatever to interfere in the matter. It is, however, evidence of the strong desire of the Legislature to act in good faith, and to keep within the pale of the law. Having thus obtained the assent of Congress, the Legislature passed an act authorizing the

sale of the sixteenth section in each township with the *assent of the inhabitants,* the proceeds to be placed in one of the banks of the state, and to carry interest at the rate of 6 per cent. per annum, payable quarterly, and secured to the people of the township whose lands were thus sold.

It is very clear that power must exist somewhere to control the subject of the grant, so as to make it subserve the purpose it was designed for. The state very properly supposed that this power was lodged with the inhabitants of the respective townships; a majority therefore were authorized to act, and, if in their opinion a sale of the land was advisable, to make sale thereof. The whole scope and design of the law is merely to give the assent of the state to such sale, and by providing the necessary machinery to carry out in action the wishes of the township, and at the same time afford the inhabitants a guaranty that the principal of the proceeds of such sale should be forever kept inviolate for the benefit of posterity, and the annual interest only be consumed by the existing generation. The act authorizing these sales, passed in 1828 (Laws 1827, 1828, p. 31) requires the assent of the inhabitants of the township to such sale to be ascertained by taking the vote of the qualified electors resident in the township, a majority of whom voting in the affirmative was necessary to a sale.

This doctrine was quoted and re-affirmed in *Hardy v. Br. Bank at Montgomery,* 15 Ala. 722, in which a certain part of an act authorizing the cancellation of sales of sixteenth section lands was held void for reasons stated in the opinion. These two cases were again referred to, in the case of *State v. Mills,* 52 Ala. 487, where it was said: "The state is a trustee of the sixteenth section granted by Congress for the use of

schools. But the state is a mere trustee, holding only the legal title in trust for the inhabitants of the several townships in which the lands are situate. The inhabitants of the township, not the state, are the cestuis que trust. *Long v. Brown*, 4 Ala. 622. Hence it was held, in *Hardy v. Br. Bank at Montgomery*, 15 Ala. 722, that the Legislature could not by mere enactment rescind or annul a contract for the sale of the sixteenth section, without the assent of the inhabitants of the township,. or a majority of them."

In the case of *Miller v. State*, 38 Ala. 600, the question first arose as to whether or not these lands could be acquired by adverse possession. Therein the authorities were reviewed, and the grants and the statutes. were construed, and it was decided that title to such lands could be acquired by adverse possession, and that the statute of limitations of 10 years was availing as a defense to an action, brought in the name of the state, to recover such lands. In that case it was said: "By the act of Congress of 2d March, 1819, for the admission of Alabama into the Union, the sixteenth section in every township was granted 'to the inhabitants of such township, for the use of schools.' This court has held that the legal title to these lands could not vest in the inhabitants of the township, as they had no corporate existence; nor could such a capacity be conferred on them by the act of Congress. And the construction placed upon this act has been that the grant is in perpetuity to the inhabitants of the respective townships,. and that the legal title to the land is in the state, in. trust for the inhabitants of the respective townships in which the lands is situated. *Long v. Brown*, 4 Ala. 629, 631; Code 1852, § 501. This trust the state has executed. As early as 1819 agents were appointed to take care of the lands, and subsequently school commission-

ers were appointed and trustees required to be elected by the township for the management of the land and the schools in each township, and the officers thus provided for were respectively declared bodies corporate. By the Code the inhabitants of the respective townships are incorporated, and the election of school trustees provided for, who are intrusted with the management of the sixteenth section, and are expressly authorized to direct suits at law or in equity, in all cases affecting the interest of such township. Code, §546. It is not to be doubted that, by virtue of the general authority conferred upon them by the law, as it stood before the Code, the commissioners were clothed with the power to direct suits to recover the possession of the sixteenth section, when it was improperly held by a third person. Clay's Digest, 520, §§7, 8; Id. 521, § 9; Id. 522, secs. 12, 13."

Though the state is a party to this suit, it has no real interest in the litigation. If there be a right of recovery, the property sued for belongs not to the state but to the township, so that, in point of fact, the suit is substantially between the township and the defendant. The Code expressly provides that, in all cases where suits are brought in the name of the person having the legal right for the use of another, the beneficiary must be considered as the sole party on the record. Code, §§ 2130, 2383. In our opinion, the rule that the statute of limitations does not run against the state has no application to a case like the present, where the state, though a nominal party on the record, has no real interest in the litigation, but its name is used as a means of enforcing the rights of a third person, who alone will enjoy the benefits of a recovery. *Miller v. State, Use, etc.*, 38 Ala. 602, 603, 604.

This decision has been followed in the cases of *Wyatt v. Tisdale,* 97 Ala. 594, 12 South. 233; *Cox v. University,* 161 Ala. 639, 49 South. 814; *State v. Schmidt,* 180 Ala. 374, 61 South. 293. The opinions in the two cases last mentioned discussed and reviewed the authorities at some length on this question, and held that the statute of limitations of 20 years applied to sixteenth section lands; the statute having been expressly changed as to such lands since the decision in *Miller's Case,* 38 Ala. 600. If the statute of limitations applies to actions by the state to recover these lands, and if they can be acquired by adverse possession, and can be sold and title passed, in accordance with the statutes made and provided for this purpose, then surely they can be leased if the leases are made in accordance with the statutes.

It is true that the acts of Congress above referred to and some of our statutes require that the sale or lease shall be made by and with the consent of the inhabitants of the township. The act, however, does not require that the sale or lease shall be made by the inhabitants individually or as a corporation, nor how their consent shall be ascertained or evidenced so as to authorize the sale; nor does it appear that the leases in question were made without the consent of the inhabitants. It does appear, however, that the leases were made by the state, the trustees, acting by and through the boards—bodies constituted by the state as its agents and officers in the premises. It is insisted, however, that this authority to the agent is void because in violation of the trusts imposed by the grants. It was certainly contemplated by Congress, in making the grants, that the lands should be both sold and leased, and that the sales and leases should be by the state for

the use of the inhabitants, and it appears that the leases in question were so made, and made for such purpose.

The state, of course, can make these sales and leases, only by and through its agents and officers, and it certainly can constitute, appoint, and authorize its agents by acts of the Legislature (which it has done in this case). The only thing not affirmatively shown in this case is that the leases in question were made without the consent of the inhabitants acting either individually or as a corporation, and, construing the bill most strongly against the pleader, we must presume that the leases were made with the consent of the inhabitants, if their consent be required.

To hold that these lands cannot be sold or leased would be, in effect, to defeat the object of the grant. The lands would be of little use to the "inhabitants of the township for the use of the schools" if they could not be sold or leased. And as the acts of Congress and the statutes both provide that the leases and sales shall be made by the state for the use of the inhabitants of the respective townships, the sales and leases can, of course, be made only by the state, and by and through some of its constituted and authorized agencies and officers. This, we think, is conceded by the appellant. Counsel for the state insist, however, that the sale or lease must be in pursuance of the original act of the Legislature, and with the consent of the inhabitants, and not in accordance with the local act of February 15, 1876 (Acts 1875, 1876, p. 363), for Mobile county.

It is to be observed that the acts of Congress do not require the sales to be made by the township or the inhabitants, but by the Legislature, by and with the consent of the inhabitants. The consent of the inhabitants was not required by Congress or by the Legislature as to leases of the lands. The original and subsequent acts

of the Legislature as to the sales of these lands pro-
vided different modes for obtaining the consent of the
inhabitants to the sales.   These statutes have been re-
peatedly changed by local and general statutes, and,
while the various acts have usually provided some mode
for ascertaining the consent of the inhabitants, they have
never held that the sales were void for failure to com-
ply with the statutes.   These statutes at times have pro-
vided for ascertaining this consent at general and spe-
cial elections held for that purpose.   It would there-
fore be difficult, at this date, to ascertain whether or
not the consent of the inhabitants to a sale of the lands
had ever been ascertained.   Their consent was not usu-
ally required as to any one particular sale, but as to
any sale at any time.   Any number of elections may
or may not have been held under these various statutes.
This court could not judicially know whether the con-
sent of the inhabitants of a given township had ever
been ascertained during the last 75 years.   If the Leg-
islature could authorize the sale of these lands 75 years
ago, they could do so now.   If they could provide a
mode for ascertaining the consent of the inhabitants
75 years ago, they can now.   If they could so provide
by a general law, they could by special ones.   A great
number of general and special laws as to the sales and
leases of these lands have been passed at many sessions,
if not at every session, of the Legislature during the
last 75 years.   The act of Congress never provided that
the consent of the inhabitants to a sale should be ob-
tained more than once.   The statutes have never pro-
vided that such consent should be obtained as to leases.
The various statutes have often contained different pro-
visions as to the leases.   At times the statutes have
provided that certain of these lands should be surveyed
and plotted, and timber lots set apart and leased for

[The State v. Board of School Commissioners of Mobile County.]

the purpose of planting and cultivating timber. As to other lands, the statutes have provided that no timber should be cut therefrom nor other waste committed, and that "the lessees must in no case cut down, injure, or destroy such timber without the permission from the trustees, which may be given on such terms as they think proper, having a due regard to the interest of their township."

An examination of the statutes, general and local, since the beginning of the government shows conclusively, we think, that the entire management and control of these lands, so far as the sales and leases of the same are concerned, has been by the Legislature committed to its agents and officers appointed or elected as provided. If the land is to be leased for agricultural purposes, it must be cleared of its timber, and, if it must be cleared of its timebr, it would be strange if the school trustees, commissioners, or boards could authorize the clearing of the lands for agricultural purposes, yet could not sell, or authorize the sale of, the timber, or, if the lands were covered with long leaf pine timber and suitable for turpentine purposes, could not lease or authorize their lease for such purposes.

It is a matter of common knowledge that some of the best farming lands in the state were covered originally with heavy, virgin forest, and where the timber was long leaf pine the trees were first turpentined, then felled, and sawed into lumber. It would be strange logic and law that would authorize the destruction of this timber by felling it and burning it; but that would not authorize the sale or other use of it. On the other hand, if the land is valuable chiefly for the turpentine it will produce, why should it not be leased for this purpose? If extracting the turpentine from the trees renders their preservation difficult and uncertain, and

the timber is the chief value, why should not the land be leased for the purpose of taking this timber therefrom?

We are unable to see the reason why such use of the land and of the timber was not contemplated by the act of Congress and by the statutes of the state. If the land contained coal, as much of it did, would it be said that the law never contemplated leasing the land for the purpose of taking the coal therefrom?

Lands should be devoted to the use for which nature and commerce have made them most valuable. We are not informed as to the particular nature or character of the scores of different tracts of land involved in this suit; but, if one falls under any one of the classes we have mentioned above, we see nothing wrong or unwarranted in the leases or uses complained of in this bill, The bill shows, and we judicially know, that sixteenth section lands and others like them have for a long time been devoted to the use to which the lands in question are being devoted. As a matter of history, this is true in other states, as to which there were similar grants of similar lands for similar purposes. The books of many states are full of statutes and decisions of the courts as to the sales and leases of these sixteenth section and indemnity lands, and in no instance have we been able to find a statute or decision which would condemn a use of the lands described in this bill, if the lands were by the laws of nature and commerce suited for such use. It is true that statutes may be found in this and other states, prohibiting the destruction of the timber on certain of these lands which had been set apart for particular purposes; but the classification of the lands, and the uses to which each class should be devoted, are matters usually vested by law in the discretion and judgment of the school boards, trustees or superintendents,

etc. If these agencies and officers act in good faith in the matter, the courts usually decline to revise their discretion. In this case there is no charge of bad faith, but only of lack of authority.

If we were in doubt about the proper construction to be placed upon our statutes and the acts of Congress as to these sixteenth section lands, the contemporaneous construction, placed upon these various statutes by the courts and by the officers whose duty it was to construe them, should be looked to in reaching our conclusion in this case.

The Supreme Court of the United States has spoken as follows upon the subject: "It is an acknowledged principle of law that, if rights have been acquired under a judicial interpretation of a statute which has been acquiesced in by the public, such rights ought not to be impaired or disturbed by a different construction, and, if, notwithstanding Treasury Regulation No. 384, requiring protests to be special in each case, a practice has grown up in the different ports of entry of receiving prospective protests, the annulment of such practice might entail serious consequences upon importers who had acted upon the faith of its validity. As early as 1803 it was held by this court, in *Stuart v. Laird,* 1 Cranch, 299, 309, 2 L. Ed. 115, that a practical construction of the Constitution that the justices of the Supreme Court had a right to sit as circuit judges, although not appointed as such, was not open to objection. 'It is sufficient to observe,' says the court, 'that practice, and acquiescence under it, for a period of several years, commencing with the organization of the judicial system, affords an irresistable answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or

controlled.  Of course, the question is at rest, and ought not now to be disturbed.'  In all cases of ambiguity, the contemporaneous construction, not only of the courts but of the departments, and even of the officials whose duty it is to carry the law into effect, is universally held to be controlling.—*McKeen v. De Lancy's Lessee*, 5 Cranch, 22, 3 L. Ed. 25; *Edwards' Lessee v. Darby*, 12 Wheat. 206, 6 L. Ed. 603; *United States v. Alexander*, 12 Wall. 177, 20 L. Ed. 381; *Peabody v. Stark*, 16 Wall. 240, 21 L. Ed. 311; *Hahn v. United States*, 107 U. S. 402, 2 Sup. Ct. 494, 27 L. Ed. 527; *Rogers v. Goodwin*, 2 Mass. 475; Endlich on Stats. § 357." *Schell's Ex'rs v. Fauche*, 138 U. S. 562, 572, 11 Sup. Ct. 375, 34 L. Ed. 1040.

There cannot at this late date be any question that the title to these sixteenth section lands passed out of the United States by the Congressional grants, and that the title thereto passed thereby into the state or the inhabitants of the township, one or both. This being true, the lands passed into the control of the state, subject to the conditions of the grant, and to the rights of the inhabitants of the respective townships for whose benefit the grant was made. It is very true that there is a difference in the decisions of the courts, which has been heretofore pointed out by this court, as to whether these grants vested the legal title in the state or in the inhabitants of the respective townships; but all agree that all title did pass out of the United States by virtue of these grants.

In the case of *Vincennes University v. Indiana*, 14 How. 268, 273, 274, 14 L. Ed. 416, it is said: "The reservations for the seminaries of learning and for schools are made in the same terms, and in some respects must rest on the same principles. In all the western states, north of the Ohio, similar reserves for schools and semi-

naries of learning have been made. In the case of *Wilcox v. Jackson* (13 Pet. 498 [10 L. Ed. 264]), this court held that a reservation set apart the thing reserved for some particular use, and that, 'whensoever a tract of land shall once have been legally appropriated to any purpose, it becomes separated from the public lands.' In the states where school lands have been reserved, the Legislatures have enacted laws to carry out and effectuate the benign policy of the general government. Special authority has been given to individuals elected in the respective townships to lease the lands, sue for rents, etc., exercising, to some extent, corporate powers. The citizens within the township are the beneficiaries of the charity. The title to these lands has never been considered as vested in the state, and it has no inherent power to sell them, or appropriate them to any other purpose than for the benefit of schools. For the exercise of the charity under the laws, the title is in the township. No patent has been issued by the federal government in such cases, as it has not been considered necessary. For the sale of school lands the consent of Congress has been obtained, as that changes the character of the fund." "Land, at common law, may be granted to pious uses before there is a grantee in existence competent to take it, and in the meantime the fee will be in abeyance. *Town of Pawlett v. Clark et al.,* 9 Cranch. 292 [3 L. Ed. 735]; *Witman v. Lex,* 17 Serg. & R. (Pa.) 88 [17 Am. Dec. 644]. 'When a corporation is to be brought into existence by some future acts of the corporators, the franchises remain in abeyance until such acts are done, and when the corporation is brought into life the franchises instantaneously attach to it. There is no difference between the case of a grant of land or a franchise to an existing corporation and a grant to a corporation brought into life for the very

purpose of receiving the grant. As soon as it is in esse, and the franchise and property become vested and executed in it, it is as much an executed contract as if its prior existence had been established for a century.' *Dartmouth College v. Woodward,* 4 Wheat. 518 [4 L. Ed. 629]."

In the case of *Wilcox v. Jackson,* 13 Pet. 498, 517, 10 L. Ed. 264, this is made certain. It is said: "We hold the true principle to be this, that whenever the question in any court, state or federal, is whether a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then that property, like all other property in the state, is subject to state legislation, so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States."

We have treated this case as the lower court and counsel have treated it—as if the lands in question were a part of those grants by Congress above referred to by our courts and by the Supreme Court of the United States. We have also treated the case as if the provision of our Constitution (section 270) excepting Mobile county from the operation of that particular article of the Constitution, or any act of the Legislature passed in pursuance thereof, had no effect upon the case. If, however, there should have been error in this respect, the result of this suit must be the same, as the bill evidently proceeded upon the theories, and the state of facts, and the laws, which we have considered.

It follows from what we have said that there is no equity in the bill, and that the special chancellor was correct in sustaining the demurrer to the bill. It also follows that it is unnecessary for us to consider or treat

19—183

the other grounds of demurrer or the questions raised and discussed by the various attorneys in their briefs and argument. If we are right in the conclusion which we have reached, the decision necessarily disposes of the case whatever might be decided as to the other questions.

Affirmed.

DOWDELL, C. J. and McCLELLAN and SAYRE, JJ., concur.